[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 27, 2004
THOMAS  K. KAHN
CLERK

_____

No. 03-10795

_____

D.C. Docket No. 01-07935-CV-JEM

GUIRLAINE O'ROURKE,

Plaintiff-Appellee,

versus

CHRISTOPHER HAYES, individually,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 27, 2004)**

Before TJOFLAT and MARCUS, Circuit Judges, and MUSGRAVE[*], Judge.

---

[*] Honorable R. Kenton Musgrave, Judge, United States Court of International Trade, sitting by designation.

TJOFLAT, Circuit Judge:

## I.

Plaintiff Guirlaine O'Rourke was the office manager for her husband's medical office. Sylvester Brown was a probationer who sometimes performed "odd jobs" for her; he had listed O'Rourke's office with his probation officer as a place of employment. In late 1997, Brown informed O'Rourke that he was trying to get in touch with Christopher Hayes, his probation officer, but they kept missing each other.

On December 3, 1997, Hayes called O'Rourke to inquire about Brown's whereabouts. O'Rourke told Hayes that Brown would be visiting the office at 2:00 P.M. that day to wash her husband's car. Hayes never mentioned to O'Rourke that Brown had violated his probation, and did not ask her to keep his phone call a secret.

Later that morning, Brown came by the office to pick up some cleaning supplies and O'Rourke mentioned that Hayes was looking for him. Brown subsequently left. Around noon, while the office was not yet open to patients, Hayes and several police officers knocked on the door. When O'Rourke opened it, Hayes identified himself. O'Rourke remarked that she had told Brown that Hayes was looking for him; Hayes replied, "You shouldn't have told him that."

2

As she and Hayes were talking, one of the other officers asked to enter the office; she declined, stating, "No, I told you, he's not here. . . . I'm in the middle of eating lunch. I'm getting ready for office hours. You can't come in." The officers then asked her a series of questions about Brown's whereabouts and whether she was hiding him inside. She again informed them that Brown was coming back at 2:00 p.m., to wash the car, but they refused to believe her. At least one of the officers became sarcastic and abusive, repeatedly declaring—despite the fact that O'Rourke was a married woman—that Brown was probably her boyfriend and she was hiding him. There is no evidence anywhere in the record that O'Rourke was rude to any of the officers at any time, notwithstanding their provocations.

When the officers continued to insist upon entering, O'Rourke closed and locked the door. She dialed 911 and requested that someone tell the officers to leave. The police dispatcher told her that there was no one at the police station who could help her and directed her to open the door to admit the officers. Throughout the phone call, the police continued to pound on the door; Hayes himself testified, "I thought the police were—they were going to knock the door down. I mean, she wasn't letting us in." Finally, O'Rourke relented and unlocked the door. The officers, including Hayes, entered and began to "look[] around"

3

various rooms throughout the entire office.[1] Hayes "held a piece of paper inches from plaintiff's face" that was apparently an arrest warrant for Sylvester Brown. One of the officers, Cathlene Fromm, placed O'Rourke under arrest for attempting to withhold consent for the officers' unauthorized entry. Fromm originally claimed that O'Rourke was being arrested for resisting arrest, but later changed the charge to obstruction of justice, which a county court judge dismissed.

O'Rourke filed this suit against Hayes and the police officers who accompanied him in their individual capacities, the City of Fort Lauderdale (which employed the officers), and the Secretary of the Department of Corrections (who employed Hayes) in his official capacity. She brought claims under 42 U.S.C. § 1983, alleging that her Fourth Amendment right to be free of unreasonable searches was violated. She also asserted pendent state law false arrest, invasion of privacy, and trespass claims against the defendants, and a malicious prosecution claim against Fromm. Hayes moved for summary judgment on the basis of qualified immunity, but the district court denied it. Hayes then took this interlocutory appeal under the collateral order doctrine,[2] and we now affirm.

---

[1] There is some testimony that Hayes first went to the car to retrieve the arrest warrant for Brown before following the officers inside. This fact is irrelevant to our inquiry.

[2] Typically, courts of appeals may hear only "appeals from . . . final decisions of the district courts of the United States." 28 U.S.C. § 1291. In Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985), the Supreme Court held that "a district

II.

Government officials sued for acts committed in the course of their official duties may invoke the defense of qualified immunity. To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting "within the scope of his discretionary authority." Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995). A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) ("If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity."). In making this determination,

> [i]nstead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. . . . In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

Holloman v. Harland, No. 01-13864, 2004 U.S. App. LEXIS 10586, at *20-21

court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291, notwithstanding the absence of a final judgment." Consequently, we have jurisdiction over Hayes's appeal.

5

(11th Cir. May 28, 2004).

Thus, in determining "whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities." Id. at 21. In the instant case, Hayes was clearly exercising a legitimate job-related function; it is well within a probation officer's duties to assist in the location and apprehension of individuals suspected of violating their probation. Similarly, traveling to and searching a place where a suspected probation violator is believed to be is a legitimate means of pursuing that job-related goal. The fact that he may have conducted his investigation in an unconstitutional manner does not undermine that fact.

Once a government official demonstrates that he is potentially entitled to qualified immunity, the burden shifts to the plaintiff to demonstrate that the official is not actually entitled to it. Id. at 15-16. The plaintiff must show that the defendant violated a constitutional right, and that the right was clearly established at the time of the alleged violation. Id. at 16. When qualified immunity is asserted in the context of a motion to dismiss, we look to the pleadings to see if the plaintiff has successfully alleged the violation of a clearly established right.

6

See Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003). When, as here, qualified immunity is asserted in the context of a motion for summary judgment, we look at the evidence in the record, interpreted in the light most favorable to the plaintiff. Based on this evidence, we must determine if there is a reasonable dispute of material fact over whether the defendant violated the plaintiff's clearly established constitutional rights. See Dahl v. Holley, 312 F.3d 1228, 1233 (11th Cir. 2002).

The evidence, interpreted in the light most favorable to O'Rourke, is sufficient for a jury to conclude that her Fourth Amendment rights were violated. "Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," United States v. United States District Court, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752 (1972), its protection extends to any area in which an individual has a reasonable expectation of privacy. See Minnesota v. Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 472, 142 L. Ed. 2d 373 (1998) ("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . ."). Offices and other workplaces are among the areas in which individuals may enjoy such a reasonable expectation of privacy. See O'Connor v. Ortega, 480 U.S. 709, 716, 107 S. Ct.

1492, 1497, 94 L. Ed. 2d 714 (1987) ("Within the workplace context, this Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police."); See v. City of Seattle, 387 U.S. 541, 543, 87 S. Ct. 1737, 1739, 18 L. Ed. 2d 943 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); see also Oliver v. United States, 466 U.S. 170, 178 n.8, 104 S. Ct. 1735, 1741 n.8, 80 L. Ed. 2d 214 (1984) (mentioning "[t]he Fourth Amendment's protection of offices and commercial buildings").

Absent exigent circumstances, police must have a search warrant to enter any area in a place of business that is off-limits to the general public. As the Supreme Court held in the seminal case of Marshall v. Barlow's, Inc., "What is observable by the public is observable, without a warrant, by the Government inspector as well. The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents." 436 U.S. 307, 315, 98 S. Ct. 1816, 1822, 56 L. Ed. 2d 305 (1978); see also Donovan v. Lone Steer, Inc., 464 U.S. 408, 414, 104 S. Ct. 769, 773, 78 L. Ed. 2d 567 (1984) (noting that government officials may not "make nonconsensual entries into areas not open to

8

the public" in a business). Cf. Colonnade Catering Corp. v. United States, 397 U.S. 72, 78, 90 S. Ct. 774, 778, 25 L. Ed. 2d 60 (1970) (Burger, C.J., dissenting) ("The government agents needed neither a warrant nor these statutes to secure entry to this place of business since it was as open as any business establishment that seeks to sell goods and services to the public."). Given that the office was not open to the public at the time Hayes and the officers accompanying him sought entry, O'Rourke had a reasonable expectation of privacy therein which was sufficient to trigger Fourth Amendment protection.

Hayes contends that merely entering the office was insufficient to constitute a "search" for Fourth Amendment purposes. We disagree with his narrow interpretation of the term "search." In Skinner v. Railway Labor Executives' Association, the Supreme Court essentially defined a "search" as any governmental act that violates a reasonable expectation of privacy. 489 U.S. 602, 617, 109 S. Ct. 1402, 1413, 103 L. Ed. 2d 639 (1989). It held, "Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . these intrusions must be deemed searches under the Fourth Amendment." Id.; see also United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85 (1984) ("A 'search' occurs when an expectation of privacy that society is prepared to consider

9

reasonable is infringed."). Thus, Hayes's mere entry into the office was enough to violate the Fourth Amendment. Cf. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2797, 111 L. Ed. 2d 148 (1990) ("The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." (emphasis added)); Michigan v. Tyler, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949, 56 L. Ed. 2d 486 (1978) ("[A] warrantless entry by criminal law enforcement officers may be legal where there is compelling need for official action and no time to secure a warrant."). This fact is made most apparent in the Supreme Court's cases requiring that officers "knock and announce" themselves when executing a search warrant. The Court held, "[I]n some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment." Wilson v. Arkansas, 514 U.S. 927, 934, 115 S. Ct. 1914, 1918, 131 L Ed. 2d 976 (1995). Even if it is "unreasonable" for an officer to enter a building unannounced, such an act would not violate the Fourth Amendment unless entry into the building itself constituted a "search."

The only case Hayes is able to muster in support of his argument that he had not engaged in a search, Haerr v. United States, 240 F.2d 533 (5th Cir. 1957)[3], was

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

handed down in 1957 by the former Fifth Circuit. In <u>Haerr</u>, we held that "a search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest. . . . Mere observation, however, does not constitute a search." <u>Id.</u> at 535. The defendant in <u>Haerr</u> had been pulled over by immigration officials near the border. When one of the agents shined his flashlight into the car, it appeared as if the defendant was attempting to conceal two boxes from him. The agent asked what was in the boxes, and the defendant sped off. The agents gave chase and the defendant was eventually apprehended.

On appeal, the defendant argued that the officers lacked probable cause to search the car by shining a flashlight into the interior and peering through the window. We rejected that claim, holding that a search had not occurred. <u>Id.</u> ("The investigator's conduct was reasonable in every respect and we cannot say that a search was ever instituted."). <u>Haerr</u> is best interpreted as a "plain view" case—officers have the right to make observations from any place where they have the right to be. <u>See</u> <u>United States v. Woods</u>, 560 F.2d 660, 669 (5th Cir. 1977) ("The plain view doctrine permits law enforcement officers the full use of their eyes in places the officers have a right to be.") (Goldberg, J., dissenting); <u>Gil</u>

11

v. Beto, 440 F.2d 666, 667 (5th Cir. 1971) ("No Fourth Amendment rights are violated when police officers are lawfully on the premises and merely observe what is in plain view."). Haerr does not purport to allow the police to enter a building without a warrant or exigent circumstances to make "mere observations"—observations from a vantage point from which the officer lacks the legal right to stand are unconstitutional searches. Unlike the agent in Haerr, Hayes did not simply make "plain view" observations from a place where he had the right to be, but he entered O'Rourke's office without a warrant or exigent circumstances. Even if he did not actually rummage around the office or go through closets or cabinets, his mere presence inside revealed to him things that he would otherwise have been unable to ascertain. This constitutes a "search" under the well-established precedents discussed above, and renders Haerr easily distinguishable. Moreover, to the degree the definition of a "search" offered in Haerr is narrower than the conception embodied in the subsequent Supreme Court cases discussed above, those cases are clearly controlling. See United States v. Marte, 356 F.3d 1336, 1344 (11th Cir. 2004) ("[O]nly the Supreme Court or this Court sitting en banc can judicially overrule a prior panel decision."). Consequently, Haerr does not render Hayes's entry constitutionally permissible.

Given that the Fourth Amendment applies to offices, and O'Rourke had a

12

reasonable expectation of privacy in the office at the time Hayes arrived because it was closed to the public, a warrant or some other exigent circumstance was necessary to support his entry. See Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971) ("[T]he most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."), overruled in part on other grounds by Horton v. California, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); Lombard v. Louisiana, 373 U.S. 267, 274, 83 S. Ct. 1122, 1126, 10 L. Ed. 2d 338 (1963) (Douglas, J., concurring) ("[W]hen the police enter private precincts they must, with rare exceptions, come armed with a warrant issued by a magistrate."). As we held in United States v. Bachner, if a person

> establishes an expectation of privacy and that the search and seizure took place without a search warrant, then the burden of proof shifts to the state to establish that an exception to the search warrant requirement was applicable in the subject case and that the search and seizure was, in fact, a reasonable one.

706 F.2d 1121, 1126 (11th Cir. 1983).

Hayes did not have a search warrant, and can point to no exigency justifying his search. Consequently, even if a factually similar case did not exist, his actions

13

would still have violated rights that are clearly established under these general statements of principle.  See Hartsfield v. Lemacks, 50 F.3d 950, 955 (11th Cir. 1995) ("[The plaintiffs] have failed to direct us to an identical case in which an officer's actions were held to be unconstitutional. . . . [However,] [g]iven the per se rule against warrantless searches and the guidance of the [Supreme Court's] description of reasonable policy efforts, all reasonable police officers should have known that [the defendant's] acts . . . violated the law.").

Hayes points to the fact that he had an arrest warrant for Brown.  The arrest warrant would have been sufficient to allow Hayes to enter Brown's home if he had reason to believe that Brown was there.  Payton v. New York, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639 (1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.").  It was clearly insufficient, however, to authorize him to enter the premises of any third party, even if he believed Brown might be there.  In Steagald v. United States, 451 U.S. 204, 205-06, 101 S. Ct. 1642, 1644, 68 L. Ed. 2d 38 (1981), the Supreme Court held that in the absence of exigent circumstances or consent, "a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party [only by] first obtaining a search warrant."

The Court's explanation as to why an arrest warrant does not give law enforcement officers the authority to enter any dwelling where they believe the suspect might be found is eminently persuasive:

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and his possessions against the unjustified intrusion of the police.

Id. at 213, 101 S. Ct. at 1648. The Court further stated:

> [T]wo distinct interests were implicated by the search at issue here—Ricky Lyons' interest in being free from an unreasonable seizure and petitioner's interest in being free from an unreasonable search of his home. Because the arrest warrant for Lyons addressed only the former interest, the search of petitioner's home was no more reasonable from petitioner's perspective than it would have been if conducted in the absence of any warrant.

Id. at 216, 101 S. Ct. at 1649-50. These considerations apply not only in homes, but in any places where a third party has a reasonable expectation of privacy. Indeed, later cases interpreted Steagald more broadly to cover not only homes, but any areas belonging to third parties. See Pembaur v. City of Cincinnati, 475 U.S. 469, 474, 106 S. Ct. 1292, 1295, 89 L. Ed. 2d 452 (1986) ("[The plaintiff's] theory was that, absent exigent circumstances, the Fourth Amendment prohibits police

15

from searching an individual's home or business without a search warrant even to execute an arrest warrant for a third person.  We agreed with that proposition in Steagald . . . ." (emphases added)).

Pembaur is remarkably similar to the instant case.  The Court held that the plaintiff had successfully articulated a Fourth Amendment claim under § 1983 against a county when the county prosecutor—acting as the final decisionmaker—ordered sheriff's deputies to use physical force to enter a medical clinic to serve arrest warrants on two clinic employees.  The plaintiff's claims against the individual officers had been dismissed because Steagald had not been handed down at the time of their actions.  Id. at 475, 106 S. Ct. at 1296.  Hayes, however, had the benefit of not only Steagald but Pembaur itself.  Thus, his conduct was clearly established as unconstitutional not only by the reasonably specific Fourth Amendment principles articulated in the cases discussed above, but by the factually indistinguishable case of Pembaur.[4]  The simple fact that he had an arrest warrant for Brown did not authorize him to enter the office where O'Rourke worked.

---

[4] Either of these separate theories would have been enough for us to conclude that his conduct was "clearly established" as unconstitutional.  We also hasten to add that Pembaur is eerily on point to a degree of specificity that far transcends the minimum threshold a plaintiff must meet to demonstrate that a constitutional right is "clearly established" based on a factually indistinguishable case.  See Vinyard v. Wilson, 311 F.3d 1340, 1351-52 (11th Cir. 2002).

16

Hayes's only remaining defense is that he did not make the initial decision to enter the office, but instead merely followed the other officers inside, "defer[ing]" to their judgment. His defense ultimately boils down to "But everyone else was doing it!" Without inquiring as to what Hayes would do if everyone else were jumping off a bridge, we recognize that precedent squarely precludes his claim. In Hartsfield, 50 F.3d at 956, we held that all officers, including those following someone else's lead, could be held liable under § 1983 if "they knew or should have known that their conduct might result in a violation of the [plaintiff's] Fourth Amendment rights." This is the same test for determining whether any government official is entitled to qualified immunity.[5] Whether or not the police officers accompanying Hayes decided to enter O'Rourke's office, their unconstitutional behavior did not relieve Hayes of his responsibility to decide for himself whether to violate clearly established constitutional rights by intruding into the office without a warrant or exigent circumstances.

In short, though Hayes was not the mastermind behind the violation of

---

[5] We are not faced with a case where a subordinate is following the seemingly reasonable orders of a supervisor. See, e.g. Brent v. Ashley, 247 F.3d 1294 (11th Cir. 2001). Nothing in the record suggests that any of the police officers were Hayes's superior, or that he was obligated to follow their orders. Moreover, since World War II, the "just following orders" defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a "reason why any of them should question the validity of that order." Id.

constitutional rights that occurred here, he must take responsibility for his actions, and may be held accountable in a court of law. Had he taken even a moment to consider the clearly established law of this circuit, he would not have followed the lead of the other officers in entering O'Rourke's office. Indeed, had the officers he accompanied displayed the courtesy, professionalism, and respect citizens have the right to expect, they would not have acted with the unbridled arrogance of those who believe they will never be held accountable for their behavior. The facts in the record, interpreted in the light most favorable to O'Rourke, make out a violation of her clearly established Fourth Amendment right to be free of warrantless searches and seizures. Consequently, her suit against Hayes may proceed.

Hayes's second contention, that the district court denied him qualified immunity based on an improper theory, borders on the incoherent. He contends that the facts upon which the district court relied in denying him summary judgment "contradicted the Appellee's own case theory and sworn testimony." While he makes a few scattered references to the record, he fails to discuss how either the original complaint or O'Rourke's deposition are inconsistent with the district court's conclusions. In short, Hayes offers nothing more than a conclusory allegation and has failed to provide us with any explanation whatsoever as to how

18

the district court's findings of fact or "theory" of the case differs materially from that put forth by the plaintiff. We find this contention—to the degree we are able to understand it—to be entirely without merit.

The judgment of the lower court is

AFFIRMED.