[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12360
Non-Argument Calendar
_____

D.C. Docket No. 6:15-cv-00094-JRH-CLR

JUDITH ALCOCER,

                                        Plaintiff - Appellee,

versus

JAILER ASHLEY LYNN MILLS,
in her official capacity,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(February 20, 2020)

Before WILLIAM PRYOR, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Plaintiff-Appellee Judith Alcocer ("Alcocer"),[1] a United States citizen born in Charleston, South Carolina, filed this 42 U.S.C. § 1983 claim for violation of her rights under the Fourth Amendment based on her roughly twenty-six-hour detention in the Bulloch County Detention Center (the "Detention Center") on January 30 and 31, 2014, on account of her purported status as an unlawfully present alien.

This case returns to us following remand in *Alcocer v. Mills*, 906 F.3d 944 (11th Cir 2018) ("*Alcocer I*"), in which we directed the district court to conduct an individualized qualified-immunity analysis for Defendant-Appellant Ashley Lynn Mills ("Mills") and another Detention Center employee.[2]  Mills appeals the district court's order denying her summary judgment on the basis of qualified immunity. The issue before the Court is whether, construing the facts in the light most favorable to Alcocer, the district court erred in that denial.  We conclude that it did not.

**I.**[3]

Alcocer was arrested on January 30, 2014, for driving with a suspended

---

[1] Although Alcocer has married and changed her name to Judith Hinojosa-Diaz after initiating this case, the we refer to her as Alcocer to avoid any confusion with respect to the record and case history.

[2] Following remand, the district court granted summary judgment based on qualified immunity to John Staten, a party in *Alcocer I* who was employed as the Jail Administrator for the Detention Center during the dates relevant to this appeal.  Alcocer has not cross-appealed that order.  Accordingly, we do not address the merits of the district court's analysis on that issue.  Nor do we express any opinion on whether there may be another appropriate defendant with regard to the Detention Center's treatment of Alcocer in January 2014.

[3] Since we are reviewing an order on a motion for summary judgment, we consider the evidence in the light most favorable to the non-moving party—here, Alcocer—and resolve all material disputes of fact in her favor. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir.

license, in violation of Georgia Code § 40-5-121.  The arresting officers took her to the Detention Center, where Mills, the jailer on duty at that time, initially processed her, beginning at approximately 3:30 p.m.

According to the record, Mills received training on all of her jobs with the Detention Center.  As part of her job duties as a jailer, Mills was responsible for completing the Detention Center's Inmate Information form with the assistance of the detainee, with as much information as she could obtain for the various boxes of the form.  As Mills concedes, the responsibility of obtaining the detainees' demographic information included asking the detainees "every question" and filling out the form as they answered.  Mills's duties also required her to put the detainees' charges in the file, list whether the detainees had any medical issues, and place "any type of holds."

When the jailer completed that process, the arrestee would then pass to another Detention Center employee for fingerprint processing.  The fingerprint officer was responsible for running the detainee's information through a series of databases.  After some time, the various database systems might return an electronic report with the detainee's name, listing any outstanding warrants or other detainers, such as an Immigration and Customs Enforcement ("ICE") hold.  If the system

---

2017) (citation omitted).  We recognize, however, that "the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case."  *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (internal quotation marks omitted).

generated a hold, Mills would make her supervisor aware.

Alcocer's Inmate Information form confirms that Mills completed Alcocer's initial intake.  The form contains Alcocer's demographic information, including her address, date of birth, driver's license number, Social Security number, height, weight, sex, race, hair and eye color, marital status, education, drug-and-alcohol-use history, and employer information.  Notably blank on the form are the spaces for birth city, county, and state.  The first note at the bottom of the form bears Mills's initials and documents that Alcocer "has no known medical issues at the time of book in" and that she "has a $2000.00 property bond."

A second note on the form, also identified with Mills's initials, reads, "CONTACT ICE IN ATLANTA GA FOR PICK UP BEFORE RELEASING." Mills contends that she placed the note there because her supervisor, Sergeant Sandra Kirkland, told her to.[4]  Mills added that second note after the Detention Center received a fax at 4:09 p.m. with the following message:

> THIS   IS   NOT   A   GOVERNMENT   DETAINER!    THIS
> INFORMATION  IS  FOR  LAW  ENFORCEMENT  USE  AND  IS
> BEING  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
> THIS RESPONSE IS NOT SUPPORTED BY FINGERPRINTS.

---

[4] The third and fourth notes in Alcocer's Inmate Information form, by contrast, both begin with the notation "Per Captain Staten," indicating that each note was entered pursuant to instructions obtained by the jailer from a superior.

4

[. . .]

I.C.E. RECORDS INDICATE THAT THIS SUBJECT IS NOT
LEGALLY IN THE UNITED STATES AND APPEARS TO BE
SUBJECT TO REMOVAL PROCEEDINGS.

Mills admitted at her deposition that she understood the plain text of the message to indicate that it was not a government detainer.

Meanwhile at some time before 6:00 p.m., Alcocer's sister completed the process with a bond company for posting Alcocer's $2,000 bond, but the Detention Center refused to post the bond because of an apparent ICE hold. Mills remained on duty until approximately 7:00 p.m. that evening. Despite the attempted posting of bond before Mills's shift ended, the Detention Center did not release Alcocer until 5:44 p.m. on January 31, a full day later.[5] And that happened only after the Department of Homeland Security sent a fax to the Detention Center instructing it to release Alcocer, after Alcocer's sister's persistent urging that Alcocer was a citizen born in Charleston, South Carolina.

Mills moved for summary judgment based on qualified immunity, and, on remand from this Court, the district court denied her motion. *Alcocer v. Bulloch Cty.*

---

[5] Alcocer's sister provided the Detention Center with information regarding Alcocer's United States citizenship during Mills's shift, but it is undisputed that she did not speak to Mills and provided documentation to the Detention Center only the following day, when Mills was no longer on duty. Thus, those facts play no role in the analysis on appeal.

*Sheriff's Office*, No. CV 615-094, 2019 WL 2207659, at *9 (S.D. Ga. May 21, 2019). This interlocutory appeal followed.

## II.

We have jurisdiction under 28 U.S.C. § 1291 to review the denial of summary judgment based on qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We review *de novo* the district court's disposition of a summary-judgment motion based on qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). "In doing so, we resolve all issues of material fact in favor of the plaintiff, viewing the alleged facts in the light most favorable to the plaintiff." *Alcocer I*, 906 F.3d at 950. We then determine, based on this version of the facts, whether the defendant is entitled to qualified immunity. *Id.* We can affirm the district court "on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

## III.

### A.

Mills argues that she did not make the decision to detain Alcocer but was simply following the orders of Kirkland to enter a note in the file. In evaluating Mills's argument, we must first note two prior considerations.

First, there is a dispute regarding who, exactly, was responsible for directing

the placement of the ICE hold in Alcocer's file. Mill testified in her deposition that it was the duty of an intake person to place holds on a detainee. The Intake Information form corroborates that testimony. The ICE hold note itself contains only Mills's initials and lacks the "per supervising officer" language contained in the subsequent entries by two other jailers to express that those notes were entered at the request of a supervisor, not at the jailer's own behest. While Kirkland attested that, in January 2014, jailers did not make decisions whether to hold individuals on ICE detainers, she also admitted that she did not have a "specific recollection" and did not recall "with certainty" some of the details surrounding Alcocer's alleged ICE detainer. Viewing these facts in the light most favorable to Alcocer, we cannot say that it was Kirkland, and not Mills, who placed the ICE hold on Alcocer on January 30, 2014.

Second, even if Mills did operate at the direction of Kirkland, she is not automatically shielded here by qualified immunity. We have held that officers may be protected by qualified immunity for actions taken at the direction of supervisors, but only so long as "nothing in the record indicates that these officers acted unreasonably in following [the supervisor's] lead, or that they knew or should have known that their conduct might result in a violation of the [plaintiff's] rights." *Brent v. Ashley*, 247 F.3d 1294, 1305–06 (11th Cir. 2001) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995)); *see also O'Rourke v. Hayes*, 378 F.3d 1201,

1210 (11th Cir. 2004) (holding that the following of one officer's unconstitutional behavior does not relieve another officer of "his responsibility to decide for himself whether to violate clearly established constitutional rights"). For the reasons explained below, the record shows that it would have been unreasonable for Mills to simply follow Kirkland's orders to place an ICE hold on Alcocer, especially because Mills was in the best position to raise the facts surrounding Alcocer's legal presence in the United States to Kirkland, yet she never did so.

**B.**

When an official asserts the qualified-immunity defense, she must first show that she was acting within the scope of her discretionary authority when she undertook the challenged action. *Alcocer I*, 906 F.3d at 951. After the official establishes that, the plaintiff bears the burden of demonstrating that qualified immunity is inappropriate. *Id.* To overcome qualified immunity, the plaintiff must demonstrate "both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." *Id.* We now consider whether Alcocer has met her burden.

**1.**

If Alcocer can prove the facts as she contends they occurred, Mills violated her constitutional right that was clearly established at the time of the violation. "A Government official's conduct violates clearly established law when, at the time of

8

the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While a case need not be exactly on point to establish notice, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

As we stated in *Alcocer I* in affirming the district court, "the precise right implicated by the facts Alcocer alleges is the Fourth Amendment right to be free from unreasonable seizures." 906 F.3d at 954. The Fourth Amendment, in relevant part, guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. Detention is a type of seizure of the person to which Fourth Amendment protections attach. *See United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

Under *Terry v. Ohio*, 392 U.S. 1, 30, (1968), an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Beyond the bounds of a *Terry* stop, however, law enforcement must have probable cause to support the seizure of a person. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where

the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."); *see also Dunaway v. New York*, 442 U.S. 200, 214–15 (1979) ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" (quoting *Davis v. Mississippi*, 394 U.S. 721, 726–27 (1969))).

The Supreme Court has long held that, beyond a *Terry* stop, the detention of a suspected alien "must be based on consent or probable cause" that the person is, in fact, an alien. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975). Indeed, the Supreme Court more recently reaffirmed this principle: "As a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States*, 567 U.S. 387, 407 (2012) (citation omitted). Supreme Court precedent also prohibits keeping a detainee in custody for a new purpose after initial entitlement to release, without new probable cause justifying the new seizure under the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005); *Arizona v. United States*, 567 U.S. 387, 413 (2012) ("[D]elay[ing] the release of some detainees for no reason other than to verify their immigration status . . . would raise constitutional concerns.").

Taken together, these principles clearly established the constitutional rights at issue here. *Morales v. Chadbourne*, 793 F.3d 208, 215–16 (1st Cir. 2015). Thus, as of January 2014, it was clearly established both that immigration arrests or detentions require probable cause and that someone's mere possibility of removability is insufficient to supply probable cause. *See Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) ("When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.").

It was also clearly established that a law-enforcement officer is "responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). Under our precedent, "an officer may not choose to ignore information that has been offered to him or her," nor may an officer "elect not to obtain easily discoverable facts." *Kingsland v. City of Miami*, 382 F.2d 1220 at 1229 (11th Cir. 2004); *see also id.* at 1230 ("[A] reasonable jury could find that the appellees' investigation was deficient in that the officers consciously and deliberately did not make an effort to uncover reasonably discoverable, material information."); *cf. Hernandez v. United States*, 939 F.3d 191, 208 (2d Cir. 2019) (holding that the city had an independent obligation to verify the citizenship of an arrestee who was subject to an immigration detainer because there was a discrepancy in the name on the detainer and the arrestee's

11

citizenship would have been verified with minimal effort, thus vitiating probable cause and stating a plausible § 1983 claim).

"Nevertheless, officers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest." *Kingsland*, 382 F.3d at 1232. The inquiry for arguable probable cause, in contrast to actual probable cause, requires us to ask "whether reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). To succeed, a plaintiff must "demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances." *Kingsland*, 382 F.3d at 1232.

**2.**

Construing the facts in the light most favorable to Alcocer, Mills's actions and omissions during her shift on January 30 do not entitle her to qualified immunity. The information Mills obtained—and information reasonably available to her—did not provide arguable probable cause to detain Alcocer after she secured bond for her release on the suspended-license charge.

The district court reasoned that a trifecta of information obtained by Mills during her intake of Alcocer "created a presumption of legal status, if not outright U.S. citizenship." *Alcocer*, 2019 WL 2207659, at *7. In particular, Mills produced

a Georgia-issued driver's license, a Social Security number, and employment information, the combination of which should have negated suspicion of illegal presence. *Id.*

Under Georgia law, only a United States citizen or an alien with legal authorization from the United States may obtain a driver's license. *See* Ga. Code Ann. §§ 40-5-1(15), 40-5-21.1, 40-5-21.2. And suspension of a driver's license is a "temporary withdrawal" of the person's license or driving privileges for a specific period, in contrast to the revocation of a driver's license, which is the "termination" of the person's license or driving privileges that are restored only by an application for a new license. *See, e.g.*, Ga. Code Ann. §§ 40-5-1(16)–(17), 40-5-50–67.2. Thus, Alcocer's possession of a Georgia driver's license—even a suspended one— created a presumption of legal status, whether as an authorized alien or a U.S. citizen. As to her possession of a Social Security number, under federal law, a person is eligible for that only if she is a U.S. citizen or an alien otherwise lawfully present in the United States. *See, e.g.*, 20 C.F.R. §§ 422.104, 422.107. And if not a citizen, a person requires legal status for employment in this country. *See, e.g.*, 8 U.S.C. § 1324a.

We add that, beyond that information considered by the district court, Mills's failure to inquire into Alcocer's place of birth as required by the Inmate Information form and the procedures of the Bulloch County Sherriff's Office further dooms her

13

qualified-immunity defense. Because the entries for "Birth City," "Birth County," and "State" are blank on the Inmate Information form, a reasonable jury could draw the inference that Mills—for whatever reason—either chose not to obtain those important details during her interview of Alcocer or ignored them if Alcocer provided them. And the combination of Alcocer's Georgia driver's license number, Social Security number, and employment status, and the fact that Alcocer was born in Charleston, South Carolina, gave Mills and the Bulloch County Detention Center more than enough tools to put to rest any debate regarding Alcocer's citizenship status. *See United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898) (affirming the principle of "citizenship by birth within the territory"); *see also Woo Jew Dip v. United States*, 192 F. 471, 474 (5th Cir. 1911) (holding that appellant was a citizen of the United States, having been born in San Francisco, California);[6] *Jolley v. I.N.S.*, 441 F.2d 1245, 1248 (5th Cir. 1971) (noting that petitioner was "a United States citizen by virtue of his birth").

These details, all within Mills's purview as the jailer who processed Alcocer upon arrival at the Detention Center and who received and entered the ICE hold on Alcocer's file, show that Mills's actions were unreasonable—whether initiated on her own or upon the order of Kirkland. Mills ignored evidence that directly

---

[6] In *Bonner v. Prichard*, the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered before October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

14

contradicted the ICE message, and she failed to reach out to ICE or her supervisor to raise these discrepancies or clarify the message's seemingly conflicting statements.  This failure is compounded by the facts that the message itself provided a phone number to direct such inquiries to and by the Detention Center's Standard Operating Procedure, which plainly provided that "the booking officer is to contact the originating agency to verify the charges and place a detainer on the inmate." There is no evidence that Mills or any other Detention Center staff contacted ICE.[7]

Once Alcocer attempted to post bond at some point before 6:00 p.m., any further detention with respect to potential immigration investigations was a new seizure requiring a new probable-cause justification. *Arizona*, 567 U.S. at 413.  Mills lacked that arguable probable cause here because there was nothing beyond, perhaps, "possible removability" under the 4:09 p.m. fax—a fax that by its plain terms, as Mills herself admits, was "NOT A GOVERNMENT DETAINER!" and was "FOR INFORMATIONAL PURPOSES ONLY."  *See Brignoni-Ponce*, 422 U.S. at 881– 82; *Arizona*, 567 U.S. at 407.

Mills was on duty when the 4:09 fax came in, and her initials alone appear on the ICE hold on Alcocer's file.  Yet Mills did nothing to satisfy herself that probable cause to maintain Alcocer in detention existed.  Indeed, Mills concedes in her reply

---

[7] To the contrary, it was only at the insistence of Alcocer's sister that ICE contacted the Detention Center, ultimately securing Alcocer's release roughly twenty-four hours after she posted bond.

15

brief on appeal that "she had no reason to believe that Alcocer was a 'foreign citizen.'" As a result of Mills's actions and omissions, a U.S. citizen continued to be unnecessarily and unlawfully detained under a completely inapplicable ICE "detainer" that ICE never intended to be applied as such. *See Morales*, 793 F.3d at 218.

The evidence, interpreted in the light most favorable to Alcocer, is sufficient for a reasonable jury to conclude that Mills violated Alcocer's Fourth Amendment rights by continuing to detain her without new probable cause after her attempted posting of bond before 6:00 p.m. on January 30, 2014. *See O'Rourke*, 378 F.3d at 1206. To rule otherwise on this record would raise real concerns about the continued unlawful detention of U.S. citizens based on legally inapplicable, groundless immigration hunches unsupported by even arguable probable cause. Mills's actions and inactions constituted a violation of Alcocer's clearly established Fourth Amendment right to be free from unreasonable seizure. Therefore, Mills is not entitled to qualified immunity.

## IV.

While we express no opinion as to the ultimate merit of Alcocer's claims, questions of material fact remain that preclude the granting of qualified immunity to Mills on this record. For the reasons that we have explained, we affirm the district court's denial of summary judgment.

**AFFIRMED.**