[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-13261
_____

D. C. Docket No. 07-01031-CV-T-E

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 7, 2010
JOHN LEY
CLERK

PATRICK JAMES GRIDER,
DANIEL JOSEPH GRIDER,
THE FOURTH QUARTER, INC.,
an Alabama Corporation d.b.a. The Skybar,

Plaintiffs-Appellees,

THE GRID, INC.,
an Alabama Corporation f.k.a. The
Highlands, d.b.a. Pulse, et al.,

Plaintiffs,

versus

CITY OF AUBURN, ALABAMA,
an Alabama Municipal Corporation, et al.,

Defendants,

JAMES TREY NEAL, III,
JASON CROOK,
CHRISTOPHER CARVER,
SLONE MADDOX,
ANDREW MEEKS,
in their individual capacities,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(September 7, 2010)

Before BLACK, HULL and KRAVITCH, Circuit Judges.

HULL, Circuit Judge:

Plaintiffs own a bar/restaurant in Auburn, Alabama and sued the City of

Auburn (the "City") and City employees under state tort law and 42 U.S.C. § 1983

for violations of the Fourth and Fourteenth Amendments. Plaintiffs primarily

claim the City and its agents filed false bribery charges and selectively enforced

regulatory laws in order to harm the Plaintiffs' business. Defendants moved for

summary judgment based on qualified immunity from the § 1983 claims and state-

law immunity from the state-law claims, which the district court denied. Upon

review, we affirm in part, reverse in part, and remand.

## I. BACKGROUND

We review the facts in the light most favorable to Plaintiffs.[1]

Plaintiff-Appellees Patrick Grider ("Grider") and his brother Daniel Grider

(collectively, the "Griders") own and operate bar and restaurant businesses in

Auburn, Alabama, including The Fourth Quarter, Inc., which is also a Plaintiff-

Appellee. The Fourth Quarter owns and operates The Skybar Café ("Skybar"), the

---

[1]The denial of qualified immunity is a question of law we review de novo. Swint v. City of Wadley, 51 F.3d 988, 994 (11th Cir. 1995). When a defendant moves for summary judgment on qualified immunity, we view the facts in the light most favorable to the plaintiff. Id. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

bar/restaurant at issue.[2]

In 1996, the Griders leased the premises at 122 West Magnolia Avenue in the City. The Griders operated several successive establishments at that location, culminating in Skybar, which opened on August 19, 2005. Since 2001, bars owned by the Griders, including Skybar, have been the subject of private complaints, and warnings by the City of Auburn Police Department ("APD"), for underage drinking, fighting, and patrons consuming alcoholic beverages after 2:00 a.m. on Sunday mornings.

In 2007, Plaintiffs filed suit against the City and ten City employees alleging the City was enforcing its laws in a discriminatory manner to try to harass them and put them out of business. Plaintiffs allege that the City and its employees placed their businesses under surveillance, improperly calculated low occupancy numbers pursuant to building safety codes, issued improper criminal citations and charges, and passed legislation concerning alcohol sales targeted at Plaintiffs.

This appeal involves only certain claims against these Defendants-Appellants: Andrew Meeks, the City's Deputy Director for Administration and Codes, and Officers James Terry Neal III, Jason Crook, Christopher Carver, and

---

[2]The Griders are the sole stockholders of The Fourth Quarter. The Fourth Quarter has existed since 1996, doing business under the names of several different bars/restaurants owned by the Griders. For the purposes of this appeal, only Skybar is relevant.

Slone Maddox, all City policemen. Each Defendant is sued in his individual capacity.[3] Plaintiffs' claims on appeal primarily concern two sets of events during 2005-2006: (1) law enforcement surveillance on September 29, 2005, culminating in a bribery charge against Plaintiff Grider; and (2) Defendant Meeks's calculations of Skybar's occupancy limit in 2005-2006, culminating in an occupancy limit of 999 persons. We describe each set of events in turn.

## A.     Surveillance and Bribery Charge

Defendants Sergeant Maddox and Officer Neal went to the City Prosecutor and asked how they could curtail the citizens' complaints about Skybar for underage alcohol consumption and alcohol consumption after 2:00 a.m. on Sunday mornings. APD Lieutenant Howell authorized surveillance at Skybar to monitor potential illegal behavior. Sergeant Maddox directed Officer Neal to begin surveillance. Neal set up video surveillance across the street from Skybar in a building that was part of the Auburn University campus. The surveillance video thus covered only the front of Skybar and not its rear.

At the time of the surveillance on September 29, 2005, Defendants Corporal

---

[3]In addition to the Defendants-Appellants here, Plaintiffs also sued City Mayor William Ham, Jr., APD Officer Jerry Sparks, City Fire Inspector Thomas Massey, City Public Safety Director William James, current City Manager Charles Duggan, Jr., and the City. The district court granted summary judgment for these defendants and dismissed them from the case. Grider v. City of Auburn, 628 F. Supp. 2d 1322, 1355 (M.D. Ala. 2009). Plaintiffs do not appeal those judgments and dismissals at this juncture.

Crook and Officer Carver were on a foot patrol downtown. On the early morning of September 29, Corporal Crook and Officer Carver received a radio call from Officer Neal informing them that Sergeant Maddox wanted Crook and Carver to go to the back room of Skybar and see whether anyone was "drinking" alcohol and report back to Maddox. At approximately 3:00 a.m., Officers Crook and Carver made their way around the back of the Skybar building and observed patrons with cups in their hands inside the bar. The officers entered an alleyway behind Skybar, opened the rear fire door of the bar, and observed several patrons inside holding clear plastic cups containing what appeared to be alcohol and others drinking from beer bottles.

Around this time, Plaintiff Grider, who was in Skybar, learned that APD Officers Crook and Carver were at the back door of the building. Grider exited the front of the building on West Magnolia Avenue, walked to Wright Street which ran along the side of the Skybar building, and walked around to the back of Skybar. Grider approached the officers and asked if everything "was okay." The officers responded that they were "checking things out." Grider informed the officers that Dale Earnhardt, Jr., was inside the bar.[4]

The parties' recollections diverge sharply at this point. While the three men

[4]Mr. Earnhardt is a well-known NASCAR racing driver.

5

were at the back of the Skybar building, Officers Crook and Carver state that after Grider told them about Mr. Earnhardt's presence, he told them that he knew people still were at the bar but would appreciate it if Crook and Carver would overlook "the violation." Officer Carver states he told Grider that he could not overlook "the fact that the Sky Bar was serving alcohol after 2:00 a.m. on a Sunday."[5] Crook and Carver state that Grider at this point offered them money if they would agree to overlook "the violation." Officer Carver told Grider that he was about to do something "very stupid." According to Crook and Carver, Grider continued to ask them to overlook the violation, stated that he would have everyone out of Skybar in ten minutes, and then offered them cash in exchange for their cooperation.

Grider allegedly left three $50 bills on the alleyway's sidewalk at the rear of the bar and then walked via Wright Street around the bar and back into its front door on West Magnolia Avenue.[6] Officer Neal, who was surveilling the front of Skybar from across the street, stated in a Special Report that he observed Patrick Grider exit the front door of the bar, walk via Wright Street around to the back of the bar, and return via Wright Street a "few minutes later." Video surveillance

_____

[5]September 29, 2005, the early morning in question, was a Thursday, not a Sunday.

[6]Officer Crook states he "realized" after returning to the police station that Grider had left three $50 bills on the sidewalk.

taken from Officer Neal's vantage point shows Grider walking out of the front of the building at 3:15 a.m. and going around towards the back of the bar. The bribery is alleged to have taken place at 3:20 a.m.[7]

Grider denies these events. Grider agrees he informed the officers that Mr. Earnhardt was in the bar. However, Grider categorically denies attempting to bribe the officers, offering them money, leaving money on the ground, asking them not to enforce any laws, or in any way interfering with the officers' activities or duties. Grider states that neither he nor his brother Daniel Grider has ever sold alcohol after the time allowed by law. Grider admitted that he did not know at the time that Skybar was under video surveillance by Officers Neal and Maddox.

Defendant Sergeant Maddox was not at the Skybar scene during the surveillance operation or the alleged bribery. Officer Carver notified Maddox of the alleged incident soon after it occurred, and Maddox informed Carver to collect the money, complete an incident report, and enter the money into evidence.[8] Officer Crook later filled out a Special Report about Grider's actions. At the time of the alleged bribery, Officer Neal was continuing the surveillance operation at

_____

[7]The video surveillance cuts off at 3:17 a.m. As noted earlier, however, the video surveillance captured only the front and not the rear of the bar and thus would not have recorded the incident.

[8]The bills were not tested for fingerprints during the Alabama state-court proceedings against Grider. The bills later were tested for fingerprints and did not contain Grider's prints.

the front of Skybar and consequently was not present with Carver and Crook at the rear of Skybar. Neal was informed of the alleged bribery after it occurred.

Shortly after Grider re-entered Skybar after speaking with Officers Crook and Carver, Officer Neal entered Skybar and told Grider, "We got you," and "I told you that we would get your license." When Grider asked what that meant, Neal stated, "You will find out."

The next day, September 30, 2005, Officer Carver signed an affidavit charging Grider with "Bribery of a Public Servant," in violation of Alabama Code § 13A-10-61, and a warrant was issued for Grider's arrest. Carver's affidavit stated Grider attempted to bribe Officers Carver and Crook so that they would overlook a violation of Auburn City Ordinance § 3-1(11), which prohibits alcohol sales after 2:00 a.m.[9]

On the same day, the APD contacted Grider and requested that he come to the police station. Grider arrived and stated his concern that Officer Neal was showing up at Skybar a disproportionate amount compared to other bars. Grider was arrested and charged with bribery.

---

[9]The Skybar is an "Option B" bar, for which then-current Auburn City Ordinance § 3-1(11)(Option B)(d) provided, "No sales of alcoholic beverages shall be made after 2:00 a.m."

The current version of the Auburn code prohibits sales of alcoholic beverages after 2:00 a.m. on Sundays and 2:30 a.m. on other days. Auburn City Code § 3-51(b)(1), (2). Alabama state law prohibits the selling or serving of alcohol after 2:00 a.m. on Sundays, but does not apply to any other day of the week. Ala. Code § 28-3A-25(a)(20), (21) (1975).

After his arrest, Grider signed a written statement, prepared by an APD detective. Grider's statement explained that at around 3:00-3:30 a.m. on September 29, 2005, he spoke with an APD officer behind Skybar, explaining to him that a total of about 10 people were in the Skybar, including Mr. Earnhardt, that "nothing illegal was going on in there," that the officers could enter the bar, but that he preferred they not go in because Mr. Earnhardt and those with him likely would leave. Grider's statement says, "I did not give anybody any money."

On November 29, 2005, the state trial court held a preliminary hearing on the bribery charge against Grider. Officers Carver and Crook testified they saw people inside Skybar holding clear plastic cups of what appeared to be alcoholic beverages and drinking from beer bottles, but they also admitted they did not have any proof that Skybar was selling alcohol after 2:00 a.m. on September 29, 2005 and did not see anyone in Skybar serving alcohol to anyone. Neal acknowledged that he had told other officers in the past of his desire to have Skybar shut down.

Grider argued that no probable cause existed to arrest him for bribery because (1) the facts did not show a violation of Auburn's City Ordinance § 3-1(11); (2) section 3-1(11) prohibits only "sales" of alcohol after 2:00 a.m.; and (3) there was no evidence that anyone at Skybar sold or served alcohol after 2:00 a.m., only that patrons continued to consume alcohol in the bar after that time. The state

9

trial court dismissed the bribery charge against Grider for lack of probable cause.[10]

Throughout the APD's investigation of Skybar in 2005, the APD compiled 10 or 11 Incident/Offense ("I/O") Reports on various alleged violations of law. In 2005, APD Lieutenant Howell called off the investigation of Skybar without issuing citations, warnings, or prosecutions other than the dismissed bribery charge against Grider.

## B.    Defendant Meeks's Occupancy Calculations

Plaintiffs also allege that Defendant Meeks participated in the City's plan to harm the Griders' business by intentionally and arbitrarily assigning Skybar an artificially low maximum occupancy load, while other inspectors assigned similar bars higher occupancy loads, in violation of the Plaintiffs' equal protection rights.[11]

As the City's Deputy Director for Administration and Codes, Defendant Meeks calculated maximum building occupancy loads for facilities like Skybar. On several occasions, Meeks calculated Skybar's occupancy limits.

---

[10]The state trial court stated: "If the defendant was charged with bribing a police officer to prevent an investigation of an alcohol offense, which they were certainly entitled to do, I think the issue of probable cause would be met, but it doesn't. The complaint states that the defendant was charged with bribing a public official so he would not enforce an ordinance which there's no evidence he was committing. So as the case is before this Court, at this time, I don't see where I have any choice but to say there's no probable cause to believe this offense, as described in the complaint, has been committed. And that will be the Court's ruling."

[11]There is no claim that Meeks participated in the police officers' surveillance of Skybar or prosecution of Grider on the bribery charge.

In 2005, the Griders began renovation and repairs to the Skybar building. During renovations preceding its opening as Skybar, the Griders remodeled approximately 14% of the Skybar location, removed 30% of the roof in the front portion of the Skybar building, and replaced the existing plywood flooring with outdoor decking in the front portion of the Skybar building. On August 19, 2005, the day Skybar opened, City Fire Inspector Thomas Massey informed Grider that Skybar could not open its rear portion until the Griders installed a fire alarm in the entire building. In response, the Griders installed a fire alarm system.

Prior to Skybar's reopening in August 2005, Grider requested that City officials assign a new maximum occupancy number. 603 was the occupancy number set for the building since 1998. In late August 2005, Defendant Meeks again set the occupancy number for Skybar at 603. Meeks arrived at this calculation by splitting Skybar into two sections – front and rear. Meeks assigned a load value of 203 persons to the front portion of Skybar and 400 persons to the rear portion of Skybar.

After this initial re-calculation, Defendant Meeks informed Grider that he could not raise Skybar's maximum occupancy classification until the Griders installed a sprinkler system throughout the entire building. On July 28, 2006, the Griders completed installing the required sprinkler system and requested a new

11

occupancy calculation. The fire alarm system was designed for a maximum load of 1,000 people.

Meeks then physically inspected the Skybar's exits, fire alarm, and sprinkler system and re-calculated Skybar's occupancy load as 933 persons in August 2006.[12] To arrive at this number, Meeks used, as part of his calculations, a 7 square-feet-per-person standard for standing or open areas.

The Griders' main claim is that Meeks should have used a 5 square-feet-per-person calculation for standing areas. Meeks did not use the 5 square-feet-per-person standard in evaluating Skybar because Meeks concluded the resultant number would have permitted occupancy exceeding the capacity of Skybar's exits and fire alarm system. In his August 7, 2006 letter to the Griders' attorney, Meeks explains his safety concerns about Skybar's exits and fire-alarm system. Meeks's August 7 letter states in part, "the fire alarm system installed in the sky bar is not the type system [sic] required for occupancies over 1000 persons." As for

---

[12]In a letter dated August 4, 2006, the Griders' attorney states: "Based upon our calculations, and calculations provided to us by independent experts, it is the Fourth Quarter, Inc. dba The Sky Bar's position that the total occupancy number for the 'Sky Bar Building' should be, at a minimum, 1097." The letter continues by saying Skybar's expert calculated that the front area "should have an occupancy level of a bare minimum of 417" and "[t]he back area of the building should have an occupancy level of a bare minimum of 680."

In an August 29, 2006 letter, the Griders' attorney then argues the total limit should be 1262, consisting of 408 in the front and 854 in the rear. Plaintiffs now argue the correct maximum occupancy calculation is 1492, comprising 600 persons in the front portion of the bar, and 892 persons in the rear portion of the bar.

12

Skybar's exits, Meeks's August 7 letter states his concern about "the risk of accidents to occupants trying to evacuate . . . in a panic situation," and discusses the violations in Skybar's exits, as follows:

> Some of these violations are; [sic] four of the five exits do not have a landing on the exterior side of the door at the same elevation as the floor inside, these landings are required to have a width equal to the door and have a travel distance of at least 42 inches. The main exit ramp exceeds the maximum slope requirement, none of the exits have emergency lighting on the exterior. There are also egress code violations inside the building on older egress elements to the dance floor and to raised platforms which occurred in the adoption of the IFC. Two exits also open to an alley way that acts as a corridor to get the occupants to a public way. This delays the occupants getting to an open and safe area away from the building.

Meeks later testified that because Skybar's exits were "severely impacted," he "reasoned that the capacity was less than any published quotient by Code that had ever been allowed by Code."[13]

In an August 29, 2006 response, the Griders' attorney states: "What The Sky Bar primarily takes issue with is the use of the 7 square feet per occupant verse [sic] the 5 square feet per occupant as required by the applicable code." The

---

[13]Meeks testified that his opinion of the inadequacy of Skybar's exits in part led him to set this occupancy calculation: "I had to come up with something after I went and looked at the exits. And basically I thought I was going out on a limb giving them what I did. I thought I was sticking my neck out pretty far giving them nine hundred – whatever I gave them initially nine hundred and something with those exits because, I mean, I have heard of several cases of noncompliant exits causing major problems in buildings, people actually getting killed."

Griders' attorney then explains in detail why the Griders believe 5 square feet per person should be used for standing areas.

In an August 31, 2006 response letter to the Griders' attorney, Meeks further explained his concerns about the Skybar's exits and how those concerns affect the total occupancy capacity. Meeks's August 31 letter reiterated that he "did not state that the fire alarm system did not enhance the occupancy of the building, only that it could not be used to enhance it to over 1000 persons." Meeks's August 31 letter also noted that the 5 square-feet-per-person minimum standard was changed anyway to 7 square-feet-per-person in the new 2006 edition of the code, which the City planned to adopt the next month, because the occupant load under the lower 5-square-feet standard had been found to be a hazard.[14]

The Griders were not happy with Meeks's revised calculation and requested at least twice that Meeks re-evaluate the occupancy load. In October 2006, the Griders notified Meeks they had improved the rear exits of Skybar.

After yet another physical inspection, Meeks increased Skybar's occupancy

---

[14]Meeks asserts his decision to use the 7 square-feet-per-person standard furthered the purpose of the City's building codes. We note that the 2003 version of the International Building Code ("IBC") states: "The purpose of this code is to establish the minimum requirements to safeguard the public health, safety and general welfare through structural strength, means of egress facilities, stability, sanitation, adequate light and ventilation, energy conservation, and safety to life and property from fire and other hazards attributable to the built environment and to provide safety to fire fighters and emergency respondents during emergency operations."

load from 933 to 999, allotting 400 persons for the front portion of the bar and 599

persons for the rear portion.[15]  Meeks avers he could not raise Skybar's occupancy

limit beyond 1,000 persons because that was the limit of Skybar's fire alarm

system.  The Griders do not dispute that Skybar's occupancy at 999 persons is the

largest bar in the City.

Plaintiffs argue Meeks arbitrarily applied more-restrictive standards to

Skybar than to two other A-2 classified bars, "In Italy" and "1716."  These two

other bars were evaluated by other City inspectors (not Meeks) and received

occupancy classifications based on the lowest 5 square-feet-per-person standard.

"In Italy" and "1716" were compliant with all City codes at the time, including

having adequate fire and sprinkler systems.  Plaintiffs do not point us to anything

in the record that shows the actual square footage and occupancy limits of "In

Italy" and "1716."  All we know is that "In Italy" and "1716" were smaller in

square footage and total occupancy limit than Skybar and that City regulators other

than Meeks used a 5 square-feet-per-person standard as part of their calculations.

Plaintiffs do not identify any record evidence showing the layout of "In Italy" or

"1716," how many total exits or the type of exits and fire alarm systems they had,

or any other details of the other inspectors' calculations as to "In Italy" and

---

[15]Grider's affidavit states that Fire Inspector Massey, not Meeks, made the October 2006 recalculation to 999 persons.  This appears to be a typographical error.

"1716."

From September 2006 to October 2007, the Griders and their employees received several overcrowding citations, but no one was ever punished for an overcrowding offense. On October 14, 2006, Fire Inspector Massey issued an overcrowding citation to Grider. A municipal judge found Grider guilty of the offense. When Grider appealed to the Alabama circuit court, the charge was nolle prossed.[16]

## C.    District Court Proceedings

In late 2007, Plaintiffs filed this suit raising § 1983 and state-law claims. Defendants moved to dismiss, but Plaintiffs then filed a motion to amend their initial complaint, which the district court granted. Defendants filed a motion to dismiss the Amended Complaint, which remains pending.

Defendants later moved for summary judgment based on, inter alia, qualified immunity and state-law immunity. The district court granted summary judgment

---

[16]Plaintiffs originally sued Fire Inspector Massey for § 1983 false arrest and malicious prosecution, and corollary state-law claims related to three overcrowding citations. The district court granted summary judgment to Massey and dismissed Massey from the case, concluding that Massey's October 2006 citation to Grider was not a Fourth Amendment seizure for the purposes of Grider's § 1983 and state-law false arrest claims, that Massey had probable cause to issue the October 2006 citation and thus was entitled to qualified immunity from Grider's § 1983 and state-law malicious prosecution claims, and that Grider did not offer enough detail to show a malicious prosecution claim arising out of Massey's November 2005 citations. Grider, 628 F. Supp. 2d at 1330-34, 1352-53, 1355. Grider did not appeal the district court's rulings as to Massey, so these issues are not before us in this appeal.

16

on certain claims, dismissed certain claims as barred by § 1983's two-year statute of limitations, and denied immunity and summary judgment on other claims. Grider v. City of Auburn, 628 F. Supp. 2d 1322 (M.D. Ala. 2009).

Defendants appealed, challenging the denial of qualified immunity on the following § 1983 claims: (1) malicious prosecution against Carver for issuing a warrant against Grider for bribery without probable cause; (2) conspiracy against Carver, Crook, Maddox, and Neal (but not Meeks) for conspiring regarding the 2005 bribery charge; and (3) equal protection against Meeks for selectively calculating the occupancy numbers for Skybar. See id. at 1334-51. Defendants also appeal the denial of state-law immunity on these state-law claims: (1) malicious prosecution against Carver for the bribery charge; (2) tortious interference with contractual and business relationships against Carver, Crook, Maddox, Neal, and Meeks; and (3) three fraud claims (deceit, fraudulent suppression, and fraudulent misrepresentation) against Meeks for the occupancy number calculations. See id. at 1352-55.[17]

---

[17]Defendants' notice of appeal raises six specific grounds: the district court's denial of qualified immunity from Plaintiffs' § 1983 claims for (1) malicious prosecution, (2) equal protection, and (3) conspiracy, and the district court's denial of state-law immunity from Plaintiffs' state-law claims for (4) malicious prosecution, (5) fraud, and (6) tortious interference. Defendants also now argue the district court erred by not ruling on their pending motion to dismiss the Amended Complaint. This argument is beyond the scope of the Defendants' notice of appeal and thus is not properly presented in this limited interlocutory appeal. Nippon Credit Bank, Ltd. v. Matthews, 291 F.3d 738, 754 (11th Cir. 2002).

17

## II. DISCUSSION

We first review the immunity doctrines involved in this appeal.[18]

### A.  Qualified and State-Law Immunity Doctrines

As to Plaintiffs' § 1983 claims, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  Qualified immunity from suit is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate qualified immunity

---

[18]Plaintiffs argue we lack jurisdiction over this interlocutory appeal because the only remaining issues for certain claims are factual issues for resolution by a jury.  We reject Plaintiffs' argument.  This case presents the "core qualified immunity" analysis of whether the facts, viewed in the light most favorable to Plaintiffs, establish that Defendants violated Plaintiffs' constitutional rights.  McMillian v. Johnson, 88 F.3d 1554, 1563 (11th Cir. 1996); accord Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985); Cottrell v. Caldwell, 85 F.3d 1480, 1485 (11th Cir. 1996).  Likewise, this Court has jurisdiction to review on interlocutory appeal the denial of discretionary-function immunity under Alabama law.  Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998).

defenses.[19]  One inquiry in a qualified immunity analysis is whether the plaintiff's

allegations, if true, establish a constitutional violation.  Hope v. Pelzer, 536 U.S.

730, 736, 122 S. Ct. 2508, 2513 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201,

121 S. Ct. 2151, 2156 (2001)).  If the facts, construed in the light most favorable to

the plaintiff, show that a constitutional right has been violated, another inquiry is

whether the right violated was "clearly established."  Saucier, 533 U.S. at 201, 121

S. Ct. at 2156.  Both elements of this test must be satisfied for an official to lose

qualified immunity, and this two-pronged analysis may be done in whatever order

is deemed most appropriate for the case.  Pearson v. Callahan, 555 U.S. ___, 129 S.

Ct. 808, 821 (2009); Brown v. City of Huntsville, __ F.3d __, No. 09-12965, 2010

WL 2243877, at *4 (11th Cir. June 7, 2010).

As for Plaintiffs' state-law claims, Alabama recognizes two types of state-

law immunity: "state-agent immunity" and "discretionary-function immunity."

Brown, __ F.3d __, 2010 WL 2243877, at *10-11 (discussing Alabama's two types

of state-law immunity).[20]  First, state-agent immunity under Alabama's common

---

[19]The initial inquiry in a qualified immunity case is whether the public official proves "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Lee, 284 F.3d at 1194 (internal quotation marks omitted).  For the § 1983 claims here, the parties do not contest that Defendants were acting within the scope of their discretionary authority.

[20]In this opinion when we refer broadly to Alabama "state-law" immunity, we mean both Alabama's common-law "state-agent immunity" and statutory "discretionary-function immunity."  When we refer to only one type of immunity, we designate which one.

law "protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." Ex parte Hayles, 852 So.2d 117, 122 (Ala. 2002). In Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which may apply to all Defendants:

> A State agent shall be immune from civil liability in his or her personal capacity [for] . . .
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>     (a) making administrative adjudications . . . ; or
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons . . . .
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

20

Ex Parte Cranman, 792 So. 2d at 405 (third emphasis supplied).[21]

The Alabama Supreme Court established a burden-shifting framework for application of the state-agent immunity test.  A defendant initially bears the burden of demonstrating that he was acting in a function that would entitle him to immunity.  Ex parte Estate of Reynolds, 946 So. 2d 450, 452 (Ala. 2006).  "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."  Id.

Second, there is statutory, discretionary-function immunity for law enforcement officers in Alabama.  Brown, __ F.3d __, 2010 WL 2243877, at *11. Specifically, § 6-5-338 of the Alabama Code contains a provision immunizing law enforcement officers from tort liability for conduct within the scope of their discretionary law enforcement duties.  Ala. Code § 6-5-338(a) (1994) ("Every peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."); id.; Wood v. Kesler, 323 F.3d 872, 883 (11th Cir. 2003).  Section 6-5-338(a) protects peace officers, such as Defendants Carver, Crook, Maddox, and Neal, but not Defendant Meeks.

---

[21]The Alabama Supreme Court formally adopted the Cranman plurality's state-agent immunity test in Ex parte Butts, 775 So.2d 173, 177-78 (Ala. 2000).

21

Cranman's test for state-agent immunity also governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6-5-338(a). Hollis v. City of Brighton, 950 So. 2d 300, 307-09 (Ala. 2006).[22] This includes the Reynolds burden-shifting framework, first requiring the the defendant law enforcement officer to show that he was acting within the ambit of his discretionary functions and then shifting the burden to the plaintiff to show "bad intent" – that the officer acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority – in order to defeat the officer's discretionary-function immunity. Brown, __ F.3d __, 2010 WL 2243877, at *11; Wood, 323 F.3d at 883; Ex parte City of Tuskegee, 932 So. 2d 895, 904 (Ala. 2005) ("The restatement of State-agent immunity as set out in Cranman, 792 So.2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a)."). Thus, Plaintiffs can pierce both state-agent immunity and discretionary-function immunity by showing that Defendants Carver, Crook, Maddox, and Neal acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Hollis, 950 So.

_____

[22]In Hollis v. City of Brighton, the Alabama Supreme Court expanded the fourth category of state-agent immunity for law enforcement officers quoted above from Cranman to include conduct for which the officers would receive statutory, discretionary function immunity through § 6-5-338(a). 950 So. 2d at 309 ("Because the peace officers' immunity statute does not limit the availability of immunity to 'enforcement of the criminal laws,' we today modify category (4) of Cranman to [include]: . . . 'serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala.Code 1975.'") (emphasis in original).

22

2d at 307 (quotation marks omitted).

**B.    Malicious Prosecution Against Carver – Qualified and State-Law Immunity**

Plaintiff Patrick Grider brought malicious prosecution claims under § 1983 and state law against Defendant Officer Carver.  On appeal, Defendant Carver argues the district court erred in denying him qualified immunity and Alabama state-law immunity.[23]

This Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." Wood, 323 F.3d at 881; accord Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008).  "[A]lthough both state law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." Wood, 323 F.3d at 882.

To establish a § 1983 malicious prosecution claim, the plaintiff must prove

---

[23]Plaintiffs' Amended Complaint does not clearly allege who asserts § 1983 and state-law malicious prosecution claims.  Count I asserts a blanket § 1983 claim by all Plaintiffs against all Defendants.  However, only Patrick Grider was charged with bribery or arrested, and the district court characterized this claim as a § 1983 malicious prosecution claim by Patrick Grider against Officer Carver, which the parties do not dispute. Grider, 628 F. Supp. 2d at 1334-35.  On remand, the district court should clarify the status, if any, of co-Plaintiffs Daniel Grider and Fourth Quarter in the remaining claims.

23

two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004); Wood, 323 F.3d at 881. As to the first prong, the constituent elements of the common law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Wood, 323 F.3d at 882.[24] The elements under Alabama law for the common-law tort of malicious prosecution are the same, except that they require only a "judicial proceeding" not a "criminal prosecution." Delchamps, Inc. v. Bryant, 738 So. 2d 824, 831-32 (Ala. 1999).

As to the second prong, it is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. Brown, __ F.3d __, 2010 WL 2243877, at *5; Wood, 323 F.3d at 882; Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). Consequently, the existence of probable cause defeats a § 1983 malicious prosecution claim. Kjellsen, 517 F.3d at 1237; Wood, 323 F.3d at 882. "Probable cause" is defined as "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had

---

[24]"When malicious prosecution is brought as a federal constitutional tort, the outcome of the case does not hinge on state law, but federal law, and does not differ depending on the tort law of a particular state." Wood, 323 F.3d at 882 n.17.

24

committed or was committing an offense." Gerstein v. Pugh, 420 U.S. 103, 111, 95 S. Ct. 854, 862 (1975) (internal quotation marks, parentheses, and citations omitted). Probable cause may exist based on the collective knowledge of law enforcement officials derived from reasonably trustworthy information. Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997).

To receive qualified immunity, an officer need not have actual probable cause, but only "arguable" probable cause. Brown, __ F.3d __, 2010 WL 2243877, at *5; Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003); Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997).[25] Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." Kingsland, 382 F.3d at 1232 (quotation marks omitted); accord Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998); Gold v. City of Miami, 121 F.3d 1442, 1445-46 (11th Cir. 1997) (disorderly conduct under Florida law); Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990). "Indeed, it is

[25]Our precedent discussing "arguable probable cause" does so in the specific context of § 1983 false arrest claims and also in the general context of Fourth Amendment claims. E.g., Wood, 323 F.3d at 881 n.13 ("[A]rguable probable cause . . . is all that is required for an arresting officer to be entitled to qualified immunity from a Fourth Amendment claim."); Crosby, 394 F.3d at 1332-33; Lee, 284 F.3d at 1195; Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999). We therefore use the same "arguable probable cause" standard in the qualified immunity context for § 1983 claims for both false arrest and malicious prosecution, as both require a violation of the Fourth Amendment. The parties agree that "arguable probable cause" controls in this case.

25

inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." Von Stein, 904 F.2d at 579 (quotation marks and ellipses omitted); see also Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (quotation marks omitted)); Montoute, 114 F.3d at 184 ("Thus, the qualified immunity standard is broad enough to cover some 'mistaken judgment []' . . . ."). The standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs. Rushing v. Parker, 599 F.3d 1263, 1266 (11th Cir. 2010).

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. Skop v. City of Atlanta, 485 F.3d 1130, 1137-38 (11th Cir. 2007); Crosby, 394 F.3d at 1333. Showing arguable probable cause does not, however, require proving every element of a crime. Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply. Skop, 485 F.3d at 1138.

Here, Officer Carver arrested Grider for bribery, in violation of Alabama Code § 13A-10-61, which provides:

(a) A person commits the crime of bribery if:
   (1) He offers, confers or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or
   (2) While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

Ala. Code § 13A-10-61(a) (1975).

Officer Carver's affidavit charging Grider with bribery stated that Grider's alleged act of bribery was committed to influence Carver's enforcement of City Ordinance § 3-1(11), which prohibited "sales of alcoholic beverages" after 2:00 a.m. Officer Carver argues that the district court erred (1) in finding no arguable probable cause for the bribery charge, and (2) in not finding arguable probable cause to arrest Grider for the "closely related" crime of obstruction of a government function in Ala. Code § 13A-10-2.

Taking the facts in the light most favorable to Grider, the district court correctly denied qualified immunity and state-law immunity to Carver. Grider and Carver offer completely different versions of the bribery events. Grider admits to speaking to Carver outside Skybar and to asking Carver to leave to avoid scaring off Mr. Earnhardt and other patrons. However, Grider unambiguously denies

27

offering any money to Carver. Absent the offering of funds, there is no bribery and no arguable probable cause for Carver to arrest Grider. Furthermore, Grider claims that the officers wanted to close Skybar and set up video surveillance of the front of the bar but did not uncover violations of law, and therefore Officer Carver fabricated the bribery at the rear as an effort to close Skybar. Thus, assuming Grider's version of events, Officer Carver knew no bribery occurred, knew he had no arguable probable cause to arrest Grider, and acted intentionally and maliciously in an effort to close Skybar. Grider has shown, at least at this juncture, a Fourth Amendment constitutional violation for his seizure without arguable probable cause. And in the qualified immunity context, it is well established that arrests without probable cause violate the Fourth Amendment. See Wood, 323 F.3d at 882-83; Crosby, 394 F.3d at 1332.

The facts, in the light most favorable to Grider, also show the required elements of the common-law tort of malicious prosecution by Officer Carver. Under Grider's version of the events, Officer Carver wholly fabricated the bribery charge against him, lacked probable cause, and had a malicious intent. Carver's bribery charge against Grider was dismissed in Grider's favor and caused him damage. Because this type of § 1983 claim for malicious prosecution is well established, the district court did not err in denying qualified immunity at this summary judgment stage to Carver.

28

Officer Carver's reliance on Alabama's obstruction of a government function statute is misplaced. Carver argues Grider interfered with his ability to arrest the Griders for violating the City's alcohol laws. However, Grider's version of events was that he told Carver "nothing illegal was going on in" Skybar, that the officers could enter the bar, and that Grider preferred they not go in because Mr. Earnhardt and those with him likely would leave. Thus, Grider did not prohibit any officers from entering the bar. Additionally, Alabama's obstruction offense does not apply to "the obstruction, impairment or hindrance of the making of an arrest." Ala. Code § 13A-10-2(b).[26]

Officer Carver also does not receive either type of state-law immunity. As noted earlier, Alabama's state-agent immunity and statutory, discretionary-function immunity for law enforcement officers do not apply for acts taken willfully, maliciously, fraudulently, in bad faith, beyond authority, or under a mistaken

---

[26]The Alabama Code defines obstruction of a government function as:
 (a) A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he:
  (1) Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or
  (2) Intentionally prevents a public servant from performing a governmental function.
 (b) This section does not apply to the obstruction, impairment or hindrance of the making of an arrest.
Ala. Code § 13A-10-2. "A 'governmental function' is defined at § 13A-10-1, Ala. Code 1975, as '[a]ny activity which a public servant is legally authorized to undertake on behalf of a government.'" A.A.G. v. State, 668 So.2d 122, 126 (Ala. Crim. App. 1995) (emphasis in original).

interpretation of law.  Ex parte City of Tuskegee, 932 So. 2d at 904 (discussing

discretionary-function immunity); Sheth, 145 F.3d at 1238-40 (same); Wood, 323

F.3d at 883 (same); Ex parte Cranman, 792 So. 2d at 405 (discussing state-agent

immunity).  Because Grider's version of events shows lack of arguable probable

cause and malice, Officer Carver is not entitled to Alabama's discretionary-

function immunity.  Cf. Borders v. City of Huntsville, 875 So. 2d 1168, 1180, 1182

(Ala. 2003) (police officer would not be entitled to statutory, discretionary-

function immunity from malicious prosecution claim if he acted without arguable

probable cause and with malice).  Alabama's state-agent immunity also does not

apply to Carver for the same reasons.  See Hollis, 950 So. 2d at 307.

For all these reasons, the district court properly denied qualified immunity

and Alabama state-law immunity to Defendant Carver for Grider's malicious

prosecution claims brought under § 1983 and state law.  Therefore, we remand this

case for trial on Grider's malicious prosecution claims against Carver under § 1983

and state law.

C.     **Conspiracy Claim Against Carver, Crook, Neal, and Maddox –
       Qualified Immunity**

The district court denied qualified immunity to Defendants Carver, Crook,

Neal, and Maddox from Plaintiffs' claim of conspiracy to maliciously prosecute

Grider for bribery.[27]  On appeal, the Defendants argue that the district court erred

in three ways: (1) it incorrectly determined that an underlying constitutional

violation existed; (2) it erroneously found that the evidence was sufficient to show

a conspiracy by Crook, Maddox, and Neal in Carver's prosecution of Grider for

bribery; and (3) it misapplied the intracorporate conspiracy doctrine.  Defendants'

arguments over the non-existence of an underlying constitutional violation are a

rehash of Defendant Carver's argument against the § 1983 and state-law claims for

malicious prosecution.  As we explained above, Grider's version of the events

adequately establishes § 1983 and state-law claims for malicious prosecution

against Carver.  The question now is whether Grider's evidence shows Crook,

Neal, and Maddox conspired with Carver to make up the bribery charge.

A plaintiff may state a § 1983 claim for conspiracy to violate constitutional

rights by showing a conspiracy existed that resulted in the actual denial of some

underlying constitutional right.  GJR Invs., Inc. v. County of Escambia, 132 F.3d

1359, 1370 (11th Cir. 1998).  "The plaintiff attempting to prove such a conspiracy

must show that the parties 'reached an understanding' to deny the plaintiff his or

---

[27]At oral argument, Plaintiffs conceded that they do not assert a conspiracy claim against Defendant Meeks.  In fact, the district court entered summary judgment against the Plaintiffs on their conspiracy claim against all Defendants with respect to the alleged improper occupancy calculations.  Grider, 628 F. Supp. 2d at 1351.  The district court denied summary judgment only "with respect to Officers Carver, Crook, Maddox, and Neal for the conspiracy claim based on the 2005 bribery charge."  Id.

her rights. The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy." Bendiburg v. Dempsey, 909 F.2d 463, 468 (11th Cir. 1990) (citations omitted). A plaintiff claiming a § 1983 conspiracy must prove the defendants "reached an understanding" to violate the plaintiff's constitutional rights. Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1122 (11th Cir. 1992) ("[T]he linchpin for conspiracy is agreement."). Factual proof of the existence of a § 1983 conspiracy may be based on circumstantial evidence. Burrell v. Bd. of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992).

The first problem for the Plaintiffs is the lack of evidence that Neal and Maddox conspired with Carver to maliciously prosecute Plaintiff Grider. The record does not indicate that either Maddox or Neal knew about the alleged bribery before it was reported to them by Carver. Maddox was not at the Skybar scene at the time of the alleged bribery. There is nothing in the record suggesting that Maddox and Neal reached an agreement or understanding with Carver, before the alleged bribery, to fabricate the bribery charge against Grider.[28] At best, the record shows that Maddox and Neal assisted Carver (and other officers) in investigating

[28]Grider contends the timing of Neal's surveillance constitutes circumstantial evidence that he agreed to assist Carver in fabricating a bribery charge. Although Neal did turn off the video surveillance shortly before the alleged bribery, Neal's surveillance recorded only the front of the building and thus would not have disproved Carver's allegations.

32

Skybar and the Griders on September 29, 2005. But showing that Maddox and Neal "conspired" to investigate Skybar, which is lawful and part of their duties as law enforcement officers, is a far cry from showing that Maddox and Neal agreed to fabricate, and then maliciously prosecute Grider for, a bribery crime he did not commit.

Likewise, what happened after the alleged bribe also does not show involvement by Maddox and Neal in a bribery conspiracy. The fact that Neal went into Skybar and told Grider "we got you" does not suggest that Neal conspired to wrongfully prosecute Grider for bribery, but rather that he was simply aware of Carver's <u>report</u> of the alleged bribe. At best, Maddox and Neal became <u>aware</u> of the alleged bribe only <u>after it occurred</u>, which is not sufficient. Maddox and Neal also had no involvement in the bribery prosecution after Grider's arrest. Rather, Carver filed an affidavit supporting Grider's arrest warrant. And as noted earlier, it was not unlawful to surveil the front of the building.

As for Crook, however, Grider's evidence, accepted as true at this juncture, indicates that Crook was involved in Carver's bribery charge against Grider. In his affidavit, Crook states that Grider told Crook and Carver that "he had a dollar for each of" them if they would overlook the violations of law, that Grider told the officers he would leave money on the sidewalk for them, and that Grider left three $50 bills for the officers (which Crook states he realized afterward at the police

33

station).  Crook filed a Special Report, stating that Crook observed Grider "set the money on the ground . . . ."

Although Grider's evidence shows Crook was involved with Carver's bribery charge, Grider's <u>conspiracy</u> claim against Crook fails because of the intracorporate conspiracy doctrine.[29]  Specifically, "[t]he intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."  <u>McAndrew v. Lockheed Martin Corp.</u>, 206 F.3d 1031, 1036 (11th Cir. 2000) (<u>en banc</u>).  "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  <u>Id.</u>;[30] <u>accord</u> <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (stating "the only two conspirators identified . . . are both City employees; no outsiders are alleged to be involved" and concluding intracorporate conspiracy doctrine barred plaintiffs' § 1985(3) conspiracy claims for deprivation of their equal protection rights).  "The doctrine

[29]The conspiracy claim fails as to Maddox and Neal too, but we rely also on lack of evidence as to those defendants.

[30]Some courts treat "scope of employment" as an exception to, rather than part of, the intracorporate conspiracy doctrine itself.  <u>See</u> <u>Johnson v. Hills & Dales Gen. Hospital</u>, 40 F.3d 837, 840 (6th Cir. 1994) ("Aware of this possibility, courts have created a 'scope of employment' exception that recognizes a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place").  However, our Court treats scope of employment more as part of the formulation of the intracorporate conspiracy doctrine itself.  <u>See</u> <u>McAndrew</u>, 206 F.3d at 1036.

34

applies to public entities such as the City and its personnel." Denney, 247 F.3d at 1190; see Rehberg v. Paulk, __ F.3d __, 2010 WL 2788199, at *19 (11th Cir. July 16, 2010) (concluding intracorporate conspiracy doctrine barred § 1983 conspiracy claim against a county employee); Dickerson v. Alachua Cnty. Comm'n, 200 F.3d 761, 767-68 (11th Cir. 2000) (concluding intracorporate conspiracy doctrine barred plaintiff's § 1985(3) conspiracy claim for interference with his civil rights); Chambliss v. Foote, 562 F.2d 1015 (5th Cir. 1977)[31] (affirming 421 F. Supp. 12 (E.D. La.) district court's summary judgment opinion applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim against a public university and its officials).

Both Defendants Carver and Crook are law enforcement officers with the APD. No outsiders are involved. The subject of their alleged conspiracy – prosecution of Plaintiff Patrick Grider by making a false bribery charge – involves job-related functions well within Defendants' scope of employment as police officers. We recognize that one might reasonably believe that violating someone's constitutional rights is never a job-related function or within the scope of a police officer's employment. However, the question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted

_____

[31]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

unconstitutionally. The scope-of-employment inquiry is whether the employee

police officer was performing a function that, but for the alleged constitutional

infirmity, was within the ambit of the officer's scope of authority (i.e., job-related

duties) and in furtherance of the employer's business.[32]

In Grider's case, we thus ask whether it was within Officer Crook's job

duties or scope of authority to make bribery charges against Grider, not whether he

was authorized or employed to file false bribery charges in furtherance of the

City's business.[33] All of Crook's acts were clearly within the scope of his

---

[32]Traditionally, the scope of employment inquiry has looked to the employee's scope of authority. Compare Black's Law Dictionary 1465 (9th ed. 2009) (defining "scope of employment" as "[t]he range of reasonable and foreseeable activities that an employee engages in while carrying out the employer's business; the field of action in which a servant is authorized to act in the master-servant relationship"), with id. (defining "scope of authority" as "[t]he range of reasonable power that an agent has been delegated or might foreseeably be delegated in carrying out the principal's business," and cross-referencing "scope of employment" definition).

[33]Similarly, in qualified-immunity cases, we examine whether a public official's acts fall within his "scope of authority" and thus his "discretionary functions," not whether he was authorized to commit an illegal act. See O'Rourke v. Hayes, 378 F.3d 1201, 1205-06 (11th Cir. 2004); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004); Maggio v. Sipple, 211 F.3d 1346, 1350-51 n.2 (11th Cir. 2000); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282-83 (11th Cir. 1998). The scope-of-authority "'inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology.'" Holloman, 370 F.3d at 1266 (quoting Harbert Int'l, Inc., 157 F.3d at 1282). Rather, "we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id. (noting "we do not ask whether police have the right to use excessive force. . . . We instead ask whether they have the power to attempt to effectuate arrests"); accord O'Rourke, 378 F.3d at 1205 ("'we do not ask whether [a police officer] has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities'") (quoting Holloman, 370 F.3d at 1266); see Sims v. Metro. Dade Cnty., 972 F.2d 1230, 1236 (11th Cir. 1992) (rejecting contention that "any time a government official violates clearly established law he acts beyond the scope of his

36

employment as a law enforcement officer. In furtherance of the City's business, Crook visited Skybar culminating in discussions with Patrick Grider at the rear of the bar, and filed a "Special Report" regarding Patrick Grider's actions. Carver, not Crook, signed the affidavit on which the bribery arrest warrant was issued. Our inquiry is not whether Officer Crook had the authority to prosecute in an unconstitutional manner and with malicious intent, but instead whether engaging in prosecutions is part of Crook's job-related powers and responsibilities. And, of course, law enforcement officers are empowered precisely to prosecute violations of law. Therefore, the intracorporate conspiracy doctrine bars Plaintiffs' § 1983 conspiracy claims against APD Officers Carver and Crook.

The only remaining question is whether there are any exceptions to this doctrine. In Dickerson, we observed that other circuits, while applying the intracorporate conspiracy doctrine in § 1985 civil rights cases, have recognized exceptions (1) for "convictions involving criminal charges of conspiracy," (2) where the employee has an "independent personal stake" in his unconstitutional acts and is not acting to further the corporation's illegal objective, or (3) where the employees "engage in a series of discriminatory acts as opposed to a single action" over a significant period of time in the employment setting. Dickerson, 200 F.3d at

discretionary authority" as "untenable" and explaining that "the question of whether the defendants acted lawfully [is distinct from] the question of whether they acted within the scope of their discretion").

37

768-70 & n.9 (collecting and discussing cases from other circuits).[34]

Because none of those exceptions applied to the facts of <u>Dickerson</u>, we "[did] not reach the issue of whether to adopt them in this circuit." <u>Id.</u> at 770.[35] Subsequently, in the § 1985(2) context in <u>McAndrew</u>, this Court clearly recognized an exception to the doctrine for criminal conspiracies where the conduct violates the federal criminal code. <u>McAndrew</u>, 206 F.3d at 1034 ("Accordingly, we hold that just as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the federal criminal code, the doctrine cannot shield <u>the same conspiracy</u>, alleging <u>the same criminal wrongdoing</u>, from civil liability arising under 42 U.S.C. § 1985(2)" (emphasis

_____

[34]It is noteworthy that in § 1985 cases, conspiracy is a statutory element of the 42 U.S.C. § 1985 cause of action, and the intracorporate conspiracy doctrine, if applicable, thus would bar relief in certain § 1985 cases. The exceptions appear to have developed to reduce the impact of the doctrine in § 1985 cases. In contrast, this is a § 1983 case where conspiracy is not a required element, and Plaintiffs' claims may proceed against the police officers if they violated constitutional rights, even if no conspiracy is shown. For purposes of this opinion, we also assume but do not decide that the other circuits' exceptions in § 1985 cases apply in § 1983 cases, because as we explain later, the facts of this case do not fit any exception.

Further, there is no allegation in this case that the corporate entity here was formed for illegitimate purposes.

[35]The district court quoted the potential exceptions listed in <u>Dickerson</u> and pointed out that <u>Dickerson</u> "did not reach any of these potential exceptions because they were unsupported by the facts of that case." <u>Grider</u>, 628 F. Supp. 2d at 1350. The district court did not appear to apply any of these exceptions either. Rather, the district court stated "[a]ll of the officers' combined actions – culminating in the unlawful bribery charge – toward, perhaps, a common goal and involving the separate exercise of their discretionary authority, cannot fairly be attributed to the city such that the meeting of the minds crucial to conspiracy liability is absent." <u>Id.</u> After discussing its view of policy problems with the intracorporate conspiracy doctrine, the district court "refuse[d] to apply the doctrine to this set of facts." <u>Id.</u> at 1350-51.

added)).

Taking McAndrew first, this case involves an alleged civil conspiracy among Officers Crook and Carver and does not involve evidence of conduct constituting a criminal conspiracy in violation of the federal criminal code. As to the other exceptions discussed in Dickerson, there is no evidence Officers Crook or Carver had an "independent personal stake" in charging Grider with bribery. As to the "series of discriminatory acts" exception, the district court granted summary judgment on all § 1983 conspiracy claims except for conspiracy to file the unfounded 2005 bribery charge. This case does not involve a series of discriminatory acts in an employment setting. In fact, Plaintiffs do not show any "series of discriminatory acts" underlying the 2005 bribery charge – all that is claimed is the fabrication of a bribe. Because none of the exceptions discussed in Dickerson would apply on the facts of this case, we, like the Court in Dickerson, do not reach the issue of whether to adopt them.

For all these reasons, we reverse the district court's order denying qualified immunity to Carver, Crook, Neal, and Maddox for Grider's § 1983 conspiracy claim.

## D.     Equal Protection Claim Against Meeks – Qualified Immunity

Plaintiffs claim a Fourteenth Amendment Equal Protection violation against Meeks for improperly calculating occupancy numbers for Skybar in a different

manner from other establishments.  On appeal, Officer Meeks argues the district court erred in denying him qualified immunity.

The parties agree this is a "class of one" equal protection claim.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074-75 (2000).  To prevail on a "class of one" equal protection claim, Plaintiffs must show they were intentionally treated differently from others who were "similarly situated" and that there is no rational basis for the difference in treatment.  Olech, 528 U.S. at 564, 120 S. Ct. at 1074; Griffin Indus. v. Irvin, 496 F.3d 1189, 1202 (11th Cir. 2007).  To be "similarly situated," the comparators must be "'prima facie identical in all relevant respects.'"  Griffin, 496 F.3d at 1204 (quoting Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006)).[36]

The district court concluded Plaintiffs had shown disparate treatment between Skybar and its two "similarly situated" competitors, "In Italy" and "1716."  Grider, 628 F. Supp. 2d at 1338-41.

Previous "class of one" decisions from the Supreme Court and this Court compel our conclusion that Plaintiffs have not shown sufficient similarity between

---

[36]"The central issue here is what degree of similarity is required for two entities to be considered 'similarly situated.'  Too broad a definition of 'similarly situated' could subject nearly all state regulatory decisions to constitutional review in federal court and deny state regulators the critical discretion they need to effectively perform their duties.  Conversely, too narrow a definition of 'similarly situated' could exclude from the zone of equal protection those who are plainly treated disparately and without a rational basis."  Griffin, 496 F.3d at 1203.

40

Skybar and "In Italy" and "1716" to state a "class of one" claim. For example, in Olech, a plaintiff landowner asked the village of Willowbrook to connect her property to the municipal water supply. Olech, 528 U.S. at 563, 120 S. Ct. at 1074. Although the village required a 15-foot easement from other property owners to connect, it demanded a 33-foot easement from the plaintiff. Id. The plaintiff sued, claiming the village's disparate requirement of a larger easement violated her equal protection rights. Id. In Olech, the Supreme Court held that the plaintiff adequately stated a "class of one" equal protection claim. Id. at 565, 120 S. Ct. at 1075. In Olech, there was a single, one-dimensional standard – a 15-foot vs. 33-foot easement – "against which departures, even for a single plaintiff, could be readily assessed. There was no indication . . . [of] subjective, individualized determinations . . . ." Engquist v. Ore. Dep't of Agric., 553 U.S. 591, __, 128 S. Ct. 2146, 2153 (2008). "The similarity between Olech and her neighbors was obvious because the Village, as the governmental decisionmaker, had a policy that did not involve a large number of factors in its application." Griffin, 496 F.3d at 1203.

The Supreme Court's Olech decision relied on two cases that were precursors to Olech's "class of one" formulation. In Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, 488 U.S. 336, 109 S. Ct. 633 (1989), the Supreme Court concluded the defendant county denied the plaintiffs

41

equal protection by setting their property tax assessment at 50% of market value based on <u>recent purchase sale prices</u>, but taxing other property owners at 50% of market value based on <u>old appraisal values of their land</u> (that had not been recently sold). <u>Id.</u> at 338-42, 109 S. Ct. at 635-37. "This practice resulted in gross disparities in the assessed value of generally comparable property," thereby denying the plaintiffs equal protection. <u>Id.</u> at 338, 109 S. Ct. at 635.

In <u>Sioux City Bridge Co. v. Dakota County</u>, 260 U.S. 441, 43 S. Ct. 190 (1923), the Supreme Court recognized an equal protection claim where one taxpayer's property was assessed at 100% of its value while all others were assessed at 55%, without the government articulating any differences in the properties that would justify the disparate assessments. <u>Id.</u> at 445-47, 43 S. Ct. at 191-92. <u>See also</u> <u>Engquist</u>, 553 U.S. at __, 128 S. Ct. at 2154 (interpreting <u>Allegheny Pittsburgh</u> and <u>Sioux City Bridge</u>).

In each of <u>Olech</u>, <u>Allegheny Pittsburgh</u>, and <u>Sioux City Bridge</u>, the Supreme Court "was able to analyze the 'similarly situated' requirement succinctly and at a high order of abstraction. This was because the challenged governmental decisions were ultimately one-dimensional – they involved a single answer to a single question." <u>Griffin</u>, 496 F.3d at 1203. However, later cases recognize that "[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."

Engquist, 553 U.S. at __, 128 S. Ct. at 2154, 2157 ("class of one" equal protection claims not viable in the public employment context). This Court's recent Griffin decision illustrates such a discretionary, multi-dimensional inquiry.

In Griffin, the plaintiff owned a chicken rendering plant that was subject to stricter regulations by city and state officials than other plants, including odor regulations "more stringent than those imposed on any other chicken rendering facility in the state" and new water quality controls. Griffin, 496 F.3d at 1195. The plaintiff claimed state regulators, pressured by city officials, were selectively enforcing regulations based on animosity towards the plant. Id. The plaintiff alleged another competitor in the Georgia chicken processing business was a similarly situated comparator. Id. at 1202.

This Court distinguished Olech's "one-dimensional" inquiry from the "multi-dimensional" inquiry presented in Griffin. Id. at 1203. Where "the government's regulatory action was undeniably multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time," the "similarly situated" comparators "'must be prima facie identical in all relevant respects.'" Id. at 1203-04 (quoting Campbell, 434 F.3d at 1314). In such cases, the government's challenged decision "must be evaluated in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged

43

decision." Id. at 1203. This is a more difficult standard to meet. Id. at 1204; Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1307 (11th Cir. 2009) (affirming dismissal of "class of one" claim over regulatory commission's consideration of "a variegated set of factors," including aesthetics and comparison with industry standards, to determine whether Toyota Prius qualified as a "luxury" limousine); Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1275 (11th Cir. 2008) (plaintiff paving contractor failed to allege other contractors were similarly situated "in light of all the factors that would have been objectively reasonable" to government officials).

Similarly, in this case, the occupancy calculation for Skybar reflected a multi-dimensional decisionmaking process. Meeks was required to consider various factors including the establishment's square footage, its segments, its emergency exit capacity, its fire and sprinkler systems, and its overall compliance with the codes and regulations. As Meeks testified, his calculation of a 999-person occupancy limit is partly formulaic but also involves discretion and judgment on the part of the regulator in determining that the overall occupancy classification adequately complies with all provisions of the codes and regulations. More importantly, the overall goal of an occupancy number is safe occupancy of buildings.

Plaintiffs argue Meeks miscalculated the maximum occupancy limits in

44

several ways.  The problem for the Griders is that this is not an appeal of Meeks's calculations to the City courts or relevant City authorities, but rather it is a § 1983 claim against Meeks in his individual capacity for denial of Plaintiffs' constitutional equal protection rights.  To prevail, Plaintiffs must show Defendant Meeks intentionally and arbitrarily treated Skybar differently from other similarly situated entities and that there is no rational basis for this difference in treatment.

Plaintiffs' equal protection claim fails for several reasons.  First, other City inspectors made the on-site calculations as to the standing areas for "In Italy" and "1716."  This difference in calculators alone is enough to negate a "class of one" claim.  Second, the record evidence, in any event, is insufficient to show the two other establishments – "In Italy" and "1716" – are similarly situated to Skybar.  For instance, the parties do not offer record citations showing: (1) how the emergency exits and fire-suppression systems in "In Italy" or "1716" compared to Skybar; (2) the layout of the exterior or interior of Skybar, "In Italy," or "1716," or even how the other two facilities were organized; and (3) the square footage of "In Italy" or "1716," much less how it compared to Skybar.  Rather, the record evidence, where any is cited, shows that Skybar was different from "In Italy" and "1716" at the time of Meeks's calculations because "In Italy" and "1716" were

smaller than Skybar and were fully compliant "with all Codes of the City."[37]

Skybar's occupancy level was constrained by its emergency exit capacity and fire alarm system but there is no evidence that "In Italy" or "1716" had such constraints. Importantly, there is no evidence of the total occupancy limits of "In Italy" or "1716" and no evidence the other inspectors let "In Italy" or "1716" exceed 1000 occupants with the same type of fire alarm system Skybar had. Third, Meeks articulated a rational basis for his calculations, and Plaintiffs have not shown Meeks acted arbitrarily or intentionally denied Plaintiffs their equal protection rights. The evidence in this case overwhelmingly shows Meeks genuinely had safety concerns about customers safely exiting Skybar and the capacity of its fire alarm system. It is difficult to fathom how allowing a late-night bar to have 999 persons at one time is putting it out of business.[38]

In sum, Plaintiffs have not shown an equal protection violation by Defendant

---

[37]Meeks's Affidavit states: "In Italy and 1716 were in compliance with all Codes of the City, such as having a fire and sprinkler system, and as such, they was [sic] permitted to use the 5 square foot per person calculation. In Italy and 1716 were smaller establishments than . . . Sky Bar." Even Plaintiffs do not claim that either "In Italy" or "1716" had occupancy limits exceeding 1000 persons or even that these bars had the same fire alarm system as Skybar. Rather, Plaintiffs differentiate between the front and rear portions of Skybar and claim the 1000 person limit as to Skybar's fire alarm system applies only to the front portion of the bar that was remodeled and that the rear portion was grandfathered in. This ignores, among other things, that this one fire alarm system is for the entire Skybar structure. Plaintiffs cite no evidence of a second fire alarm system in the rear of Skybar.

[38]The district court found that "the evidence is insufficient for a factfinder to conclude that Meeks conspired with any other person to calculate improperly the occupancy numbers for Skybar." Grider, 628 F. Supp. 2d at 1348.

46

Meeks (sued individually), and the district court accordingly erred in denying Meeks qualified immunity on Plaintiffs' equal protection claim.

Alternatively, at a minimum, Plaintiffs have not shown Meeks violated clearly established federal law. In determining whether a constitutional right was clearly established at the time of violation, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, 121 S. Ct. at 2156; see also Hope v. Pelzer, 536 U.S. at 741, 122 S. Ct. at 2516 ("the salient question . . . is whether the state of the law [at the time of violation] . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional").[39] There is no case law in the U.S. Supreme Court, this Court, or the Alabama Supreme Court with similar factual circumstances (or even addressing in any way the occupancy limits for bars in Alabama) that would have put Meeks on notice of a clearly established right that Plaintiffs have claimed in this case. Nor have Plaintiffs cited any precedential authority that would have made clear to Meeks

---

[39]This fair and clear notice requirement may be met in three ways: (1) the words of the pertinent federal statute or constitutional provision may be so specific as to clearly establish the law even in total absence of judicial decisions interpreting the law, Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002); (2) "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts," id. at 1351; and (3) most commonly, when we lack explicit statutory or constitutional pronouncements and broad case holdings, we look to precedential cases that are tied to their particular facts. Id. at 1351-52. When caselaw is needed, we look to decisions of the U.S. Supreme Court, this Court, and, where applicable, the highest court of the pertinent state. Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1032-33 n.10 (11th Cir. 2001).

47

that, given the need for safety in buildings, he was violating Plaintiffs' constitutional equal protection rights. The district court accordingly erred in denying qualified immunity to Meeks on Plaintiffs' equal protection claim.

## E.    State-Law Claims

Plaintiffs also brought state-law claims for fraud against Meeks and for tortious interference with contractual and business relations against Carver, Crook, Maddox, Neal, and Meeks. As to Plaintiffs' fraud claims against Meeks, the district court denied Meeks "discretionary-function immunity" because "the Griders have produced evidence that Meeks acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law." Grider, 628 F. Supp. 2d at 1354-55 (quotation marks omitted). As noted earlier, Meeks was not a law enforcement officer, so he cannot rely on statutory, discretionary-function immunity. However, "state-agent" immunity may extend to Meeks, which the district court also implicitly recognized by citing Cranman's state-agent immunity standards in denying immunity to Meeks. Grider, 628 F. Supp. 2d at 1354 (citing Ex parte Cranman, 792 So. 2d at 405). To be clear, we refer to the immunity potentially available to Meeks as "state-agent immunity."

As to Plaintiffs' tortious interference claims, the district court denied summary judgment without explicitly discussing any state-law immunity defenses

48

of Defendants[40] – in effect denying Defendants' immunity argument sub silentio. See Grider, 628 F. Supp 2d. at 1353.

For either type of state-law immunity to apply, Defendants first must show they were performing duties within their discretionary functions when the alleged torts occurred. Ex parte Estate of Reynolds, 946 So. 2d at 452 (state-agent immunity); Wood, 323 F.3d at 883 (discretionary-function immunity). Plaintiffs argue Defendants cannot meet this threshold requirement because "[n]o [Defendant] can prove that committing various tortious acts in furtherance of a conspiracy to put the Griders out of business is within the line and scope of any of their duties . . . ."

Considering the APD officers first, investigating and prosecuting violations of the law clearly fall within the scope of official duties of a law enforcement officer. Police investigations and arrests usually are considered "discretionary function[s] within the line and scope of . . . law enforcement duties" for the purposes of discretionary-function immunity. Swan v. City of Hueytown, 920 So. 2d 1075, 1078-79 (Ala. 2005) (law enforcement officers perform "discretionary functions" under § 6-5-338 when they "'exercis[e] judgment in the enforcement of the criminal laws,'" including "gathering of information and subsequent arrest")

---

[40]Defendants' motion for summary judgment expressly argued for state-law immunity from the tortious interference claim pursuant to both Cranman and Ala. Code § 6-5-338.

(quoting Cranman, 792 So. 2d at 405); Sheth, 145 F.3d at 1238-39 (police officers' use of force and arrest of plaintiff qualify as discretionary functions under Alabama law); Telfare v. City of Huntsville, 841 So. 2d 1222, 1228 (Ala. 2002) ("Generally, arrests and attempted arrests are classified as discretionary functions" for the purposes of § 6-5-338); Wood, 323 F.3d at 884 (law enforcement officer's issuance of driving citation and arrest were discretionary acts for § 6-5-338 immunity).

As to Meeks, Alabama's common-law state-agent immunity protects him. State-agent immunity requires that Meeks first show he was acting within a defined class of discretionary acts. Ex parte Estate of Reynolds, 946 So. 2d at 452. State-agent immunity protects a state agent for, among other things, "exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, . . . making administrative adjudications; . . . [and] discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner . . . ." Cranman, 792 So. 2d at 405; see also Wood, 323 F.3d at 883 ("Discretionary acts are 'those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.'") (quoting

50

Sheth, 145 F.3d at 1239).  Meeks's occupancy determinations easily fall within the administrative adjudications over which he was given responsibility by the City.

Thus, because all Defendants were performing discretionary acts, Plaintiffs must show sufficient "bad intent" – willfulness, malice, fraud, bad faith, actions beyond authority, or actions taken under a mistaken interpretation of law.  See Ex Parte Cranman, 792 So. 2d at 405.  For the reasons outlined above, Grider's version of events meets that requirement for Officers Carver and Crook, but not for Officers Maddox and Neal.  Thus, as to Plaintiffs' tortious interference claim, we affirm the denial of both state-agent immunity and statutory, discretionary-function immunity to Carver and Crook and reverse the denial as to Maddox and Neal.

As to Meeks, Plaintiffs have not shown Meeks's actions in regulating Skybar were willfully wrong, malicious, in bad faith, beyond his authority, or were made under a mistaken interpretation of law.  Meeks's occupancy calculations were the product of a complex, multi-dimensional evaluation.  There is no evidence that Meeks acted fraudulently, maliciously, or in bad faith in making his occupancy calculations.[41]  The record is replete with evidence that Meeks had

_____

[41]Each of the three fraud theories on which Plaintiffs rely requires the willful misrepresentation or willful suppression of a material fact.  Ex parte DaimlerChrysler Corp., 952 So. 2d 1082, 1090 (Ala. 2006) (fraudulent misrepresentation); Ala. Code § 6-5-103 (deceit); Ex parte Dial Kennels of Ala., Inc., 771 So. 2d 419, 421 (Ala. 1999) (fraudulent suppression). Because our limited interlocutory appeal addresses only immunity issues, we limit this discussion solely to whether Meeks had fraudulent intent, and we do not consider whether the record evidence sufficiently shows the other required elements of a fraud claim.  We also do not

51

relevant safety concerns about Skybar exceeding 1000 occupants due to its exits and fire alarm system and that he acted within his discretionary authority. Plaintiffs also have not shown Skybar and "In Italy" and "1716" are similarly situated. Accordingly, we reverse the district court's denial of state-agent immunity to Meeks on Plaintiffs' tortious interference and fraud claims.[42]

### III. CONCLUSION

In sum, we affirm the district court's denial of qualified immunity as to Grider's § 1983 malicious prosecution claim against Carver. We reverse the denial of qualified immunity (1) to Carver, Crook, Maddox, and Neal from Grider's § 1983 conspiracy claims, and (2) to Meeks from Plaintiffs' § 1983 equal protection claim.

As to Plaintiffs' state-law claims, we affirm the district court's denial of state-law immunity (1) to Carver from Grider's state-law malicious prosecution claim, and (2) to Carver and Crook from Plaintiffs' tortious interference claim. We reverse the district court's denial of state-law immunity to Maddox and Neal from

___

consider the merits of any other state law claims.

[42]Defendants also argue that the two-year statute of limitations for fraud claims in Alabama requires dismissal of the fraud claim against Meeks because a portion of Meeks's conduct occurred two years before the filing of this suit (November 21, 2007). This argument is beyond the scope of the Defendants' notice of appeal and is not properly presented in this interlocutory appeal. Nippon, 291 F.3d at 754 ("We will not address claims that are beyond the scope of the issue certified for an interlocutory appeal.") (quotation marks and alterations omitted).

Plaintiffs' tortious interference claim.  We reverse the denial of state-agent immunity to Meeks from Plaintiffs' tortious interference and fraud claims.

The bottom line is the case will proceed on remand against Defendant Carver on Plaintiff Grider's § 1983 malicious prosecution claim, against Defendant Carver on Plaintiff Grider's state law malicious prosecution claim, and against Defendants Carver and Crook on Plaintiffs' tortious interference claims under state law.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I concur in parts A, B, and C of the majority opinion's discussion section. I respectfully dissent, however, from the majority's conclusion in parts D and E that Andrew Meeks was entitled to qualified and state-agent immunity.

Determining whether Meeks is entitled to immunity is a fact-intensive inquiry. Because this is an interlocutory appeal from an order on the defendants' motion for summary judgment, my dissent relies on the version of these facts that is most favorable to the Griders.

First, the record contains evidence that Meeks calculated the square-footage standard for standing space in Skybar differently than for the two comparator establishments. Although the majority opinion correctly states that other inspectors made the on-site calculations for the comparator establishments (In Italy and 1716), Meeks admitted in his deposition testimony to ultimately approving a five-square-feet-per-person standard for standing space in the two comparator establishments.[1] Meeks also admitted that he assigned a higher seven-square-feet-per-person standard to "standing space" in Skybar, even though the IBC(2003) assigns a five-square-feet-per-person standard to standing space. *See* IBC § 1004

---

[1] Meeks stated that he made the decision to use a five-square-feet-per-person standard for the "concentrated areas" in the comparator establishments. Meeks later clarified that his discussion of the application of the five-square-feet-per-person standard to concentrated areas "that [he had] been talking about" corresponded to "the standing space for the concentrated areas."

tbl.1004.1.2.

Meeks explained in an August 7, 2006 letter to the Griders that he derived the higher seven-square-feet-per-person standard for Skybar's standing space from the 1997 Standard Building Code (SBC).[2] Meeks stated that he used the SBC's higher standard because Skybar's exits and fire-suppression systems were not up to the standards of the IBC(2003). He later explained that four out of the five ground-floor exits "were worse than any stair quotient in any published code" and that the fire alarm installed by the Griders could only accommodate 1,000 people. Meeks also testified that § 104.10 of the IBC(2003) authorized him to apply the SBC's standards to Skybar. Finally, he claimed that the IBC(2003) gave him the ultimate discretion to make determinations in the interests of public safety.

The Griders identify several problems with Meeks's explanations. First, they argue that under the IBC(2003), Skybar's exit capacity has no effect on the square-footage standard for standing space. They point out that § 1005.1 of the IBC(2003) requires the building inspector to factor in exit capacity only when calculating an alternative maximum occupancy figure based on the "minimum required egress width." *See* IBC § 1005.1. If this alternative number is lower than the maximum occupancy based on a square-footage standard, the IBC(2003)

_____

[2] The Standard Building Code was in effect in Auburn until the City adopted the IBC(2003) in late 2003.

requires the building inspector to calculate the maximum occupancy for the structure based on this "egress-width" number. In this case, it is undisputed that Meeks did not use this number to calculate Skybar's maximum occupancy.

Second, the Griders argue that Skybar's fire-suppression systems were up to code because Skybar was an existing building that was "grandfathered in" under § 3401.1 of the IBC(2003) and because they had added a fire alarm and sprinkler system. They also argue that the IBC(2003) only required a fire alarm for the front portion of Skybar because only that section had been recently altered. *See* IBC § 3401.1. They thus conclude that the building code only properly limited the *front* portion of Skybar to 1,000 people.

On these facts, construed in the Griders's favor, Andrew Meeks both violated clearly established federal law and acted beyond his authority. Accordingly, I respectfully dissent from the majority opinion and submit that Meeks is not entitled to either qualified or state-agent immunity.

*A. Qualified Immunity*

The majority concludes that Meeks was entitled to qualified immunity because the Griders failed to state a valid class-of-one equal-protection claim. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000). In particular, the majority concludes that the Griders did not establish that Skybar and its two comparator establishments—In Italy and 1716—are "*prima facie* identical in all relevant

aspects." *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1203–04 (11th Cir. 2007). The majority, however, fails to limit its analysis to evidence relevant to whether Skybar was similarly situated to the two comparator establishments for the purposes of assigning a square-footage standard to standing space. In particular, the majority faults the Griders for failing to provide information about (1) the emergency exits and fire-suppression systems in In Italy or 1716; (2) the layout of the exterior or interior of Skybar, In Italy, or 1716; and (3) the square footage of In Italy or 1716.

Most of this information, however, is irrelevant to determining the square-footage standard for standing space. First, the IBC(2003) does not state that the overall size of a facility is relevant to the square-footage standard to be applied to a building's standing space. Second, the exact layout of the exterior or interior of Skybar is not relevant because it is undisputed that Meeks applied a different standard to Skybar's standing space than he did to the same kind of standing space in the two comparator establishments. Finally, table 1004.1.2 of the IBC(2003) explicitly states that the building inspector should assign a five-square-feet-per-person standard to standing space; exit capacity is only relevant to the alternative maximum-occupancy load based on "egress width" that ultimately did not control Meeks's calculations.

The only arguably relevant factor cited by the majority is whether Skybar's fire-suppression systems are similar to those of the two comparators. It is

57

undisputed that the fire-suppression systems of the two comparator establishments were up to code. The Griders, however, cited the IBC(2003) to assert that their installation of a fire alarm and sprinkler system in Skybar brought Skybar's fire-prevention systems up to code and that the fire alarm only limited the front part of Skybar to 1,000 people. Meeks did not dispute these assertions. Thus, the Griders have provided enough information at this stage in the litigation to establish that Skybar's fire-suppression systems were similar to those of the two comparator establishments.

The Griders have otherwise produced evidence that all three businesses have the same zoning classification, have areas of standing space, are "existing buildings," and were assigned maximum-occupancy loads by Meeks while the IBC(2003) was in effect. These facts are enough to convince a reasonable juror that Skybar warranted similar treatment to In Italy and 1716 for the purposes of assigning a square-footage standard to standing space.

The majority also concludes that Meeks had a rational basis for treating Skybar differently from its two similarly situated comparators. *See Olech*, 528 U.S. at 564. The majority accepts two purportedly rational bases for Meeks's calculations: (1) Skybar's poor exit capacity, and (2) Skybar's fire-suppression system. The first of these is not persuasive because a reasonable juror could conclude that exit capacity does not have any bearing on the square-footage

standard for standing space. The second reason is similarly unavailing because Meeks did not dispute that the installation of the fire alarm and sprinkler brought Skybar's fire-prevention systems up to code.

Finally, to avoid qualified immunity, the Griders must establish that Meeks's allegedly discriminatory calculations violated clearly established law. *See Vinyard v. Wilson*, 311 F.3d 1340, 1351–52 (11th Cir. 2002). On this point, "the salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The Supreme Court has held that under the Equal Protection Clause, "a person has a right to be free from intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Olech*, 528 U.S. at 564. Here, Meeks had fair warning that the allegedly discriminatory application of Auburn's uniform building regulations would violate the Equal Protection Clause, and he should not have been granted qualified immunity.

*B. State-Agent Immunity*

The majority also concludes that Meeks is entitled to state-agent immunity because his occupancy calculations were discretionary and the Griders did not allege facts sufficient to establish that his actions were "willfully wrong, malicious, in bad faith, beyond his authority, or . . . made under a mistaken interpretation of

59

law." *Ex Parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000). I believe, however, that the Griders have provided enough evidence to establish that Meeks acted beyond his authority in determining the square-footage standard for Skybar.

"A State agent acts beyond [his] authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Giambrone v. Douglas,* 874 So. 2d 1046, 1052 (Ala. 2003) (quoting *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)). It is undisputed that all of the calculations of Skybar's maximum occupancy in 2005 and 2006 were governed by the IBC(2003). Meeks, however, admits to employing the SBC to calculate the maximum occupancy number for Skybar's standing space. In his deposition, Meeks claimed that he departed from the IBC(2003) because Skybar was not up to code. But, as explained above, there is evidence suggesting that Skybar was not in violation of the IBC(2003) and that its exit capacity should not have affected the square-footage standard. Thus, under the version of the facts most favorable to the Griders, there was no relevant safety reason for Meeks to depart from the IBC(2003) when calculating Skybar's square-footage standard.

Furthermore, even if Skybar had not been up to code, nothing in the record suggests that Meeks had the discretion to completely ignore the IBC(2003) and select a square-footage standard from the SBC. Meeks initially testified that he was authorized to depart from the IBC(2003) under § 104.10. But this section

would only have mattered if the Griders had petitioned for a modification. *See*

IBC § 104.10 (allowing for modifications "upon application of the owner or the

owner's representative"). Furthermore, although the IBC(2003)'s "purpose" is to

safeguard the "public health, safety and general welfare," *see id*. § 101.3, it does

not allow a building inspector to completely ignore its provisions. In fact, although

§ 104.1 of the IBC(2003) affords building officials the authority to render

"interpretations" of the IBC(2003) and to adopt "policies and procedures," it

specifically states that those policies and procedures "shall not have the effect of

waiving requirements specifically provided for in this code." *Id*. Construed in the

Griders's favor, this provision suggests that Meeks exceeded his authority when he

chose a square-footage standard from the SBC.

Thus, in my view, the Griders have alleged sufficient evidence to show that

Meeks acted outside of his authority, and he is therefore not entitled to state-agent

immunity.